UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                            :
IN RE:                                                      :
                                                            :
GENERAL MOTORS LLC IGNITION SWITCH LITIGATION   :        14-MD-2543 (JMF)
                                                            :
---------------------------------------------------------------------   :
                                                            :
DENNIS R. WARD,                                             :        Case No. 14-CV-8317
                                                            :                 (JMF)
                    Plaintiffs,                             :
                                                            :        Complaint
          -v-                                               :
                                                            :        Jury Trial Demanded
GENERAL MOTORS LLC,                                         :
                                                            :
                    Defendant,                              :
                                                            :
------------------------------------------------------------------------X

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, Dennis Ward, by and through counsel, and files this Complaint for Damages and Demand for Jury Trial, and states as follows:

## I.    INTRODUCTION

1.    This action arises out of a motor vehicle accident that occurred on March 27, 2014.  On that date, Plaintiff Dennis Ward was driving his 2009 Chevrolet HHR on South Kolb Street in Tucson, Arizona.  As he approached the intersection with East Stella Road, Mr. Ward's vehicle suddenly and unexpectedly lost power.  Due to the unexpected power failure, Mr. Ward was unable to brake his vehicle.  He then collided with another vehicle.

2.    Upon information and belief, Mr. Ward's Chevrolet HHR lost power due to a design defect in the vehicle's ignition switch, as described more fully below.

3.      As a result of the March 27, 2014 motor vehicle accident, Dennis Ward suffered significant and long-lasting injuries that continue to this day.

4.      Prior to the accident on March 27, 2014, Defendant General Motors LLC knew of the design defect in the 2009 Chevrolet HHR, yet failed to disclose the design defect or warn users of its existence.   Rather, Defendant intentionally, purposely, fraudulently, and systematically concealed the defect from Plaintiff, the federal government, and the public at large.

5.      Accordingly, Plaintiff Dennis Ward brings this action against Defendant General Motors LLC for negligence, strict liability, fraudulent concealment, and product liability under applicable law.  Further, Plaintiff Dennis Ward asserts claims against Defendant General Motors LLC for liability as a successor and mere continuation of General Motors Corporation.

6.      Further, and as set forth in more detail below, Plaintiff is compelled to file this Complaint because the Ignition Compensation Claims Resolution Facility established by Defendant General Motors LLC has unreasonably excluded accidents involving the 2009 Chevrolet HHR from eligibility for compensation.[1]   The defect in vehicles eligible for compensation through the Facility is identical to the defect present in the 2009 Chevrolet HHR. The 2009 Chevrolet HHR was recalled for an ignition switch defect at or around the same time that Defendant General Motors LLC recalled earlier model year Chevrolet HHR, Chevrolet

---

[1] A 2009 Chevrolet HHR is eligible for compensation by the Facility only if its ignition switch was replaced with an ignition switch bearing Part Number 1039423.  A 2009 HHR that has never had its ignition switch replaced is not eligible for compensation through the Facility. Plaintiff Dennis Ward never replaced his HHR's ignition switch and, therefore, his car does not meet the eligibility requirements set forth by the Claims Facility.  *See* GM IGNITION COMPENSATION CLAIMS RESOLUTION FACILITY FINAL PROTOCOL FOR COMPENSATION OF CERTAIN DEATH AND PHYSICAL INJURY CLAIMS PERTAINING TO THE GM IGNITION SWITCH RECALL    at    3    (June    30,    2014),    *available    at* http://www.gmignitioncompensation.com/docs/FINAL%20PROTOCOL%20June%2030%20%202014.pdf (last visited Oct. 7, 2014).

Cobalt, Saturn Ion, and other vehicles for the exact same ignition switch defect. Defendant's engineers developed and have knowledge of evidence that the ignition switch in the 2009 Chevrolet HHR performs below Defendant's design specifications for the ignition switch. And Defendant General Motors LLC has instituted a repair protocol under the direction of the National Highway Traffic Safety Administration (NHTSA) requiring that the 2009 Chevrolet HHR and earlier model year defective vehicles receive precisely the same repairs. Defendant General Motors LLC has, in other words, treated the recall and government-regulated repair of the 2009 Chevrolet HHR in precisely the same manner as each of the other 2.1 million vehicles recalled for defective ignition switches. Yet, Defendant General Motors LLC has, for the most part, restricted eligibility in its Claims Resolution Facility to model year 2007 vehicles and earlier. This is unreasonable. Consequently, Plaintiff, and others similarly situated, is left with no other recourse but to seek compensation for his injuries through lawsuits such as the instant action.

## II.   <u>PARTIES</u>

7.     Plaintiff Dennis Ward is and was at all times relevant hereto an adult resident of Willcox, Cochise County, Arizona. Mr. Ward was seriously injured as a result of the automobile accident described below.

8.     Defendant General Motors LLC is a citizen of Delaware and Michigan, and does business in all fifty states, including the State of Arizona. General Motors LLC's principal place of business is in Detroit, Michigan.

9.     Defendant General Motors LLC does business in the State of Arizona with its principal domestic address located at Corporation Service Company, 2338 West Royal Palm Road, Suite J, Phoenix, Arizona 85021.

10.     General Motors LLC is a limited liability corporation with one member: General Motors Holding, LLC.  General Motors Holding, LLC is a citizen of Delaware and Michigan, and is a holding company and direct parent of General Motors LLC.  General Motors Holding, LLC is a limited liability corporation with one member: General Motors Company.  General Motors Company is a citizen of Delaware and Michigan and is publicly traded.

11.     General Motors Corporation was a Delaware corporation with its headquarters in Detroit, Michigan.   General Motors Corporation, through its various entities, designed, manufactured, marketed, distributed, and sold Chevrolet, Pontiac, Saturn, and other brand automobiles in Arizona, elsewhere in the United States, and worldwide.

12.     In June of 2009, General Motors Corporation ("Old GM") filed for bankruptcy. On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets pursuant to a Master Sales and Purchase Agreement ("Agreement").   The Agreement became effective on July 10, 2009.  The Agreement approved the sale of Old GM to Defendant General Motors LLC (hereinafter "Defendant," "GM," or "New GM").

13.     The Agreement defines Defendant's "Purchased Assets" as:

> (xiv)   all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;
>
> (xv)   all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . . .

4

AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT at Section 2.2.

14.     Along with the Purchased Assets, GM also expressly took on a range of liabilities. "Liabilities" is defined in the Agreement as "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

15.     Among many others, the Liabilities assumed by GM under the Agreement include:

> (vii) (A) all Liabilities arising under express written warranties of Sellers [i.e., old GM] that are specifically identified as warranties and delivered in connection with sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser [i.e., new GM] prior to or after the Closing and (B) all obligations under Lemon Laws; . . .

> (ix) all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents, or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance; . . .[2]

> (xi) all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing; . . .

16.     GM also assumed responsibility for compliance with a wide range of laws and other regulations, including:

> (a)     From and after the Closing, Purchaser [Defendant GM] shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety

---

[2] Pursuant to an order of the bankruptcy court, this particular category of assumed liabilities is "regardless of when the product was purchased."

Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM].

(b)     From and after the Closing, Purchaser [Defendant GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] . . . (ii) Lemon Laws.

17.     Moreover, the Bankruptcy Court order approving the Agreement made clear that Defendant GM assumed "the warranty and recall obligations of both Old GM and [Defendant GM]."

18.     Pursuant to the Agreement and other orders of the Bankruptcy Court, Defendant GM emerged out of bankruptcy and continued the business of Old GM with many, if not most, of Old GM's employees and, on information and belief, with most of the same senior-level management, officers, and directors.

19.     The allegations pertaining to Old GM above are included for purposes of background and context, and to set forth the scope of Defendant GM's liabilities and responsibilities under the Agreement.  This Complaint does not assert any causes of action against Old GM; all causes of action and attributions of liability are directed solely against Defendant General Motors LLC.

## III.   **JURISDICTION**

20.     Jurisdiction is proper in this Court pursuant to Case Management Order No. 8 in *In re General Motors LLC Ignition Switch Litigation*, [14-MC-2543, Dkt. No. 36].  By filing this Complaint in this district, however, Plaintiff does not waive his right to transfer this case to the district in which he resides at the conclusion of pretrial proceedings.

21.     This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff is a citizen of a different state than Defendant.

## IV.   STATEMENT OF FACTS

### A.     The March 27, 2014 Accident

22.     On or about the morning of March 27, 2014, Plaintiff Dennis Ward was driving his 2009 Chevrolet HHR north on South Kolb Street in Tuscon, Arizona.

23.     At approximately 7:55 a.m., Mr. Ward traversed a stretch of roadway that was under construction.   Because of this construction, the roadway was uneven and caused Mr. Ward's vehicle to vibrate as it travelled over the road.   Mr. Ward's vehicle hit a bump in the road and suddenly, without warning, the power to Mr. Ward's vehicle failed.   He immediately lost power brakes.   Although Mr. Ward applied extra pressure to the brake, he was unable to stop his vehicle before it rear-ended a vehicle that was stopped in the roadway ahead.

24.     The resulting collision threw Mr. Ward forward.   Mr. Ward's head nearly hit the windshield.   His torso jerked forward into the dash and steering wheel.   Mr. Ward's right knee violently impacted the area of the HHR underneath the dashboard and to the left of the center console.   The airbags in Mr. Ward's Chevrolet HHR did not deploy during the frontal collision.

25.     At the time of the accident, the road was dry and Mr. Ward was not exceeding the posted speed limit.   Mr. Ward was wearing his seat belt.

26.     Mr. Ward suffered significant and life-altering personal injuries as a result of the March 27, 2014 accident.

27.     Mr. Ward was transported by ambulance from the accident scene to the Tucson Medical Center emergency room.  He told attending physicians that his knee was in immense pain.

28.     Within hours it became obvious to physicians that Mr. Ward's patellar tendon had ruptured.  He was unable to walk or even to extend his leg.  Mr. Ward was placed in a knee immobilizer and prescribed medication to manage his pain.  On April 1, 2014, doctors performed surgery to repair the tendon.  Mr. Ward remained in the hospital for several days following the surgery.  He was confined to a rehabilitation facility for nearly a month.

29.     The March 27, 2014 accident has caused injury, pain, and suffering that continues to this day.  Mr. Ward's ability to walk and stand has been significantly reduced.  He was unable to walk without the aid of a walker until late September 2014.  He experiences recurrent pain in his leg, and at times this pain is excruciating.  And he remains in physical rehabilitation twice weekly, re-learning how to use his injured leg.  These conditions were not present prior to the March 27, 2014 accident.

30.     To Plaintiff's knowledge and understanding, the Chevrolet HHR involved in the March 27, 2014 accident had not been substantially modified or changed in any material way from its initial condition as designed, manufactured, marketed, and sold by Old GM.

31.     March 27, 2014 was not, however, the first time that the power to Mr. Ward's HHR unexpectedly failed during ordinary vehicle operation.  In approximately January of 2014, Mr. Ward was driving along a gravel road scouting deer.  Road conditions were uneven and were causing the vehicle to vibrate.  Without warning, the vehicle's power failed.  Fortunately, no other vehicles were nearby at the time.

32.     On 3-4 other occasions, Mr. Ward's HHR unexpectedly entered "limp mode" while he was driving on the interstate.  On each of these occasions, Mr. Ward was able to pull to the shoulder and restart the vehicle.

33.     Upon information and belief, Mr. Ward's Chevrolet HHR lost power on March 27, 2014 because of a defective ignition switch, described more fully below.  That ignition switch, which is the subject of NHTSA Campaign Number 14V-047, can inadvertently and unexpectedly move out of the "run" position when, *inter alia*, an affected vehicle "experiences rough road conditions or other jarring."  Just prior to the HHR's power failure on March 27, 2014, Mr. Ward traveled across a section of roadway that was uneven, causing the vehicle to vibrate and/or shake as it moved across.

34.     Further, Mr. Ward's accident occurred just one day before GM notified NHTSA that it was recalling Mr. Ward's 2009 HHR.  GM knew, however, years prior to March 27, 2014, that the ignition switch in Mr. Ward's vehicle may fail if the vehicle experienced a jarring condition, or if the key chain was carrying added weight.  GM notified some GM dealers of this defect, but it did not notify consumers such as Mr. Ward.  Instead, GM concealed and obfuscated the fact of the ignition switch's defect—a fraud that resulted in Mr. Ward's serious and long-term injuries  on March 27, 2014.

**B.      GM Fraudulently Concealed the Ignition Switch Defect**

*1.      The Defective Vehicles Manufactured by Old and New GM*

35.     As used in this Complaint, the "Subject Vehicles" refers to GM vehicles sold in the United States equipped at the time of sale with an ignition switch sharing a common, uniform, and defective design.  The Subject Vehicles include the following makes and model years:

- 2005-2010 Chevrolet Cobalt;

- 2006-2011 Chevrolet HHR;

- 2006-2010 Pontiac Solstice;

- 2003-2007 Saturn Ion;

- 2007-2010 Saturn Sky; and

- 2005-2010 Pontiac G5.

36.     Plaintiff Dennis Ward's 2009 Chevrolet HHR falls within this group of Subject Vehicles.

37.     The ignition switches in the Subject Vehicles contain several common switch points, including "run" (or "on"), "off," and "accessory."  At the "run" position, the vehicle's motor engine is running and electrical systems have been activated; at the "accessory" position the motor is off, and electrical power is generally only supplied to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off. In most vehicles, a driver must intentionally and manually turn the key in the ignition to move to these various positions.

38.     In the Subject Vehicles, a detent plunger in the ignition switch does not generate sufficient torque to keep the detent plunger component in position.  Thus, when the vehicle and/or ignition is jarred or any additional weight is added to the key ring, the detent plunger can move, switching the ignition from the "run" position to the "accessory" or "off" position.

39.     In addition, the Subject Vehicles contain a uniformly designed ignition cylinder, with the key position of the lock module on the steering column and an ignition key with a slot for a key ring at the top.  By design, the ignition switch was placed low on the steering column, making it easy for a driver of regular height to inadvertently impact the ignition switch with his

10

or her knee while operating the vehicle.  Such an impact may jar the ignition switch and cause it to move from the "run" to the "accessory" or "off" position.

40.     The ignition switch on the Subject Vehicles is prone to fail during ordinary and foreseeable driving situations (such as traveling across bumpy or uneven roadways).  When the ignition switch "fails," and the ignition switch moves from the "run" to the "accessory" or "off" position during ordinary operation of the vehicle, the power to the vehicle is terminated (even at highway speeds), and the vehicle loses power steering and power brakes, among other things.

41.     Each of the Subject Vehicles also contains a uniformly designed airbag system that is disabled when the ignition switch on the vehicles fails during ordinary and foreseeable driving situations.  Thus, as a result of the defective design of the Subject Vehicles, a driver whose ignition switch fails may suddenly and without warning experience a vehicular power failure that also disables the vehicle's airbags, steering, and brakes.  Such a failure may occur unexpectedly and during normal operation of the vehicle.

42.     The 2009 Chevrolet HHR purchased by Dennis Ward contained the defective ignition switch and airbag system described in this Complaint.

43.     The ignition switch defect precludes drivers and owners of the Subject Vehicles, such as Dennis Ward, from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers Subject Vehicle occupants as well as those in vehicles around them. Further, because GM concealed the existence of the ignition switch defect, no driver or owner of the Subject Vehicles, including Dennis Ward, knew, or could reasonably have discovered, the ignition switch defect.

> 2.     *GM Learned of the Ignition Switch Defect Shortly After the Bankruptcy Sale, but Concealed the Defect for Years*

44.     In 2009, Old GM declared bankruptcy in the United States Bankruptcy Court in the Southern District of New York.

45.     On July 9, 2009, the United States Bankruptcy Court approved the sale of Old GM, which was converted into Defendant New GM.  From its inception, New GM, which retained the vast majority of Old GM's senior and management level executives and engineers, knew that its predecessor had manufactured and sold millions of vehicles afflicted with the ignition switch defect.  Some of the Old GM employees retained by New GM include current CEO Mary T. Barra; designer of the ignition switch and engineer Ray DeGiorgio; director of product investigations Carmen Benavides; engineer Gary Altman; engineer Jim Federico; vice presidents for product safety John Calabrese and Alicia Boler-Davis; vice president of regulatory affairs Michael Robinson; director of product investigations Gay Kent; general counsel and vice president Michael P. Milliken; and in-house product liability lawyer William Kemp.

46.     On or around the day of its formation as an entity, New GM also acquired, *inter alia*, the knowledge of the contents of Old GM's "files" and company "documents."  To that end, New GM acquired notice of the safety-related defects contained in Old GM's files, including numerous engineering reports, investigative reports, failure analyses, technical service bulletins, and other documentation concerning the defective ignition switch and airbag system described herein.

> a.      *New GM Learns of the Ignition Switch Defect*

47.     From the day of its formation as a corporate entity, New GM acquired notice and full knowledge of the following:

> a.      In 2001, during pre-production testing of the 2003 Saturn Ion, Old GM engineers learned that the vehicle's ignition switch could unintentionally move from the

12

"run" to the "accessory" or "off" position.   Old GM further learned that where the
ignition switch moved from "run" to the "accessory" or "off" position, the vehicle's
engine would stall and/or lose power.   In a section of an internal report titled, "Root
Cause Summary," Old GM engineers identified two "causes of failure," namely: "[l]ow
contact force and low detent plunger force."

       b.     Delphi Automotive PLC ("Delphi"), the manufacturer of the ignition
switches,[3] informed Old GM that the ignition switch did not meet Old GM's torque
specifications.   The Design Release Engineer for the Ion ignition switch, Ray DeGiorgio,
specifically discussed with Delphi the fact that the switches did not meet the torque
required by Old GM's specifications.

       c.     DeGiorgio also corresponded with representatives of Koyo, the supplier of
the Ion steering column into which the ignition switch was to be installed.   In his
correspondence, DeGiorgio stated that ten of twelve prototype ignition switches recently
provided by Delphi "[f]ailed to meet engineering requirements," and remarked that the
"failure is significant."

       d.     Nonetheless, rather than delay production of the Saturn Ion, and redesign
the ignition switch in order to ensure that it met Old GM's specifications, Mr. DeGiorgio
went ahead and approved use of ignition switches he knew did not meet Old GM's design
specifications.

---

[3] The ignition switch "was developed as a 'corporate common' part, meaning that it was
designed to be used in multiple vehicle platforms."   REPORT TO BOARD OF DIRECTORS OF
GENERAL MOTORS COMPANY REGARDING IGNITION SWITCH RECALLS at 19 (May 29, 2014)
(hereinafter, "Valukas Report").   The defective ignition switches were installed in, *inter alia*, the
Chevrolet HHR, Chevrolet Cobalt, Saturn Ion, Saturn Sky, Pontiac G5, and Pontiac Solstice.   *Id.*
at 18-19.   The use of common ignition switches across vehicles makes was a method to reduce
costs.   *Id.*

e. Old GM contracted with Continental Automotive Systems US, Inc. ("Continental") to manufacture the airbag system, including the sensing system, in the Subject Vehicles, including the 2003 Saturn Ion.

f. The airbag system in the Subject Vehicles was defectively designed so that it would shut off and the airbags would not deploy when the key in the ignition turned from the "run" to the "accessory/off" position during foreseeable driving operation.

g. In 2002, Old GM began manufacturing and selling 2003 Saturn Ions with the defective ignition switches and defective airbag systems.

h. In 2004, Old GM engineers reported that the ignition switch on the Saturn Ion was so weak and placed so low on the steering column that the driver's knee could easily bump the key and turn off the vehicle.

i. This defect was sufficiently serious that an Old GM engineer, Gerald A. Young, reported in January 2004 that "[t]he ignition switch is too low. All other keys and the key fob hit on the driver's right knee. The switch should be raised at least one inch toward the wiper stalk." Young then concluded that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

j. Mr. Young was not alone in his observations. In a February 19, 2004 report concerning his model year 2004 Saturn Ion, Old GM employee Onassis Matthews stated, "The location of the ignition key was in the general location where my knee would rest (I am 6' 3" tall, not many places to put my knee). On several occasions, I inadvertently turn [sic] the ignition key off while *driving down the road*. For a tall

person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position."

k.      Two months later, in an April 15, 2004 report concerning his model year 2004 Saturn Ion, Old GM employee Raymond P. Smith described a moving stall: "I thought that my knee had inadvertently turned the key to the off position."

l.      Meanwhile, a July 1, 2004 report by Siemens VDO Automotive analyzed the relationship between the ignition switch in Old GM-branded vehicles and the airbag system.   The Siemens report concluded that when an Old GM-branded vehicle experienced a power failure, the airbag sensors were disabled.  The Siemens report was distributed to at least five Old GM engineers.

m.      The Chevrolet Cobalt was in pre-production at this time.  In spite of the problems reported with the Saturn Ion's switch, Old GM installed the same ignition switch and airbag system in the 2005 Cobalt as it had in the Ion.

n.      Unsurprisingly, reports of moving stalls surfaced almost immediately around the time of the Cobalt's production launch in 2004.  At a press event in the summer or fall of 2004, a journalist informed Doug Parks, the Cobalt Chief Engineer, that while adjusting his seat in the Cobalt he was test driving, the journalist had inadvertently turned off the car by hitting his knee against the key fob or chain.  Parks asked Gary Altman, the Program Engineering Manager, to follow up on the complaint by trying to replicate the incident and to determine a fix.  Altman thereafter replicated the incident at an Old GM testing facility.

o.  Mr. DeGiorgio learned about the moving stall at the press event in 2004 and was approached by an Old GM engineer who suggested that Old GM should "beef up" the ignition switch detents.  DeGiorgio rejected this idea.

p.  Around this same time, Old GM opened an engineering inquiry known as a Problem Resolution Tracking System (PRTS) to address the complaint from the press event that a Cobalt could be "keyed off with knee while driving."  At this time, PRTS issues were analyzed by a Current Production Improvement Team (CPIT).  The CPIT that examined the Cobalt issue beginning in November 2004 included a cross-section of business people and engineers, including Gary Altman and Lori Queen, Vehicle Line Executive on the case.

q.  Old GM considered a number of potential solutions to the problem during the PRTS, including changes to the key position on the lock module and measures to increase the torque in the ignition switch.  Indeed, the CPIT characterized a suggestion to change the location of the ignition switch on the steering column from a low-mount to a higher mount as a "sure solution," but rejected it because it was too expensive.  Old GM also considered changing the key from a slot to a hole configuration.

r.  Changing the key from a slot to a hole configuration would reduce the lever arm of the key and key chain.  With the slot design, the key hangs lower on the key, which increases the torque force on the ignition switch when the chain is contacted or moved in any way.  Old GM engineers determined that changing the key to a hole configuration would lessen the consequences of impacts on the key and significantly reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position during ordinary driving maneuvers.

16

s.       Old GM engineer David Trush determined that redesigning the key to a hole design would have cost less than one dollar per vehicle.

t.       In the end, however, Old GM engineers and executives decided to do nothing.   In March of 2005, Mr. Altman, who was the Cobalt Program Engineering Manager, issued a directive to close the November 2004 PRTS with no action.   The rationale of Old GM's decision makers was that the "lead-time for all solutions is too long" and the "tooling cost and piece price are too high."   Thus, "none of the solutions represents an acceptable business case"—a standard phrase used by Old GM when closing a PRTS without action due to cost.   David Thrush, the Design Release Engineer for the Cobalt ignition cylinder, explained that an "acceptable business case" is one whose solution should solve the issue, be cost effective, and have an acceptable lead time to implement the change.   But one of the very solutions proposed by Thrush—changing the ignition key from a slot to a hole configuration—would have cost less than one dollar per vehicle.

u.       Not only did Old GM close the PRTS with no action, it also downplayed the severity of the safety threat posed, rating the specter of a moving stall (even at highway speeds) with a severity level of 3—on a scale of 1 (most severe) to 4 (least severe).

v.       On February 28, 2005, Old GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Chevrolet Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

w.     In the February 28, 2005 bulletin, Old GM provided the following recommendations and/or instructions to its dealers—**but did not provide this information to the public in general**:

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.  The concern is more likely to occur if the driver is short and has a large heavy key chain.

> In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning. The steering column was adjusted all the way down.  This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.

> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause.  The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.

> Please follow this diagnosis process thoroughly and complete each step.  If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

x.     At this time, Old GM knew that drivers were inadvertently turning off the vehicles due to design defects in the ignition switches installed in those vehicles, and not only because "short" drivers were impacting the steering column or because drivers' key chains were "heavy."

y.     Old GM failed to disclose and, in fact, concealed the February 28, 2005 bulletin, as well as the information contained therein, to Cobalt and Pursuit owners/lessees, and sent affirmative representations to dealers that did not accurately describe the nature of the problem, the multiple design steps needed for a solution to the problem, and Old GM's knowledge of the problem.

z.      Indeed, rather than disclosing this serious safety problem that uniformly affected all Chevrolet Cobalts, Old GM instead concealed and obscured the defect-related problems, electing to wait until customers brought their cars to a dealership *after* an engine-stalling incident had occurred.  Further, Old GM offered even its own dealers an incomplete, incorrect, and insufficient description of the defects and the manner in which to actually remedy them.

aa.     As of February 2005, Old GM engineers knew that the Chevrolet Cobalt ignition switches were defectively designed as discussed in this Complaint.

bb.     Pursuant to 49 C.F.R. § 573.6, which requires an automobile manufacturer to "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety," Old GM had a duty to disclose the safety-related defects in the Chevrolet Cobalt and all other Subject Vehicles as soon as it knew of them.

cc.     Instead of complying with its legal obligations, however, Old GM fraudulently concealed the ignition switch defect from the public and continued to manufacture and sell the Subject Vehicles with known safety defects.

dd.     Between February 2005 and December 2005, Old GM continued to receive reports of moving stalls and/or power failures in the Subject Vehicles.  Indeed, Old GM opened multiple PRTS inquiries during this time period regarding reports of power failure and/or engine shutdown in Subject Vehicles.

ee.     As part of one such PRTS, Quality Brand Manager Steven Oakley asked William Chase, an Old GM warranty engineer, to estimate the warranty impact of the ignition switch defect in the Cobalt vehicles.  Chase estimated that for Cobalt vehicles on the road for 26 months, 12.40 out of every 1,000 vehicles would experience inadvertent

power failure while driving.  Old GM did not provide this information to its dealers, to regulators, or to the general public.

ff.     In May 2005, a customer demanded that Old GM repurchase his Cobalt. The complainant stated that the ignition switch shut off during normal driving conditions with no apparent contact between the driver's knee and key chain or fob.  Steven Oakley forwarded this information internally, stating that the ignition switch "goes to the off position too easily[,] shutting the car off."  Oakley's email was forwarded to DeGiorgio.

gg.     The problem with moving stalls began to receive increased press attention in May and June of 2005.  On May 26, 2005, a writer for the *Sunbury Daily Item* in Pennsylvania reviewed the Cobalt and reported that "[u]nplanned engine shutdowns happened four times during a hard-driving test last week. . . . I never encountered anything like this in 37 years of driving and I hope I never do again."  Similarly, a writer for the *New York Times* reported that his wife experienced a moving power failure while driving a Cobalt.

hh.     At or around the late spring of 2005, Old GM, through Product Safety Communications Manager Alan Adler (who now works for New GM), issued the following statement regarding customer-reported engine-stalling events in the Chevrolet Cobalt:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running.
>
> When this happens the Cobalt is still controllable.  The engine can be restarted after shifting to neutral.
>
> GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid

> factors such as steering column position, seat height and placement. Depending on these factors, a driver can unintentionally turn the vehicle off.
>
> Service advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing non-essential material from their key rings.
>
> Ignition systems are designed to have "on" and "off" positions, and practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition from the run to the accessory or off position.

Old GM's statement was demonstrably misleading and false.

ii.     For example, contrary to the above-referenced statement, Old GM's internal testing documents showed that these incidents occurred when drivers were using keys with the standard key fob. Old GM knew that these incidents were not only caused by drivers with heavy key chains or as a result of a driver's seating position. Old GM knew that removing non-essential items from a key chain would not "virtually eliminate" the possibility of power failure.

jj.     Further, Old GM's above-referenced statement was demonstrably false and misleading because Old GM knew that safety incidents related to the ignition switches were the result of the safety-related defects identified in the November 2004 PRTS.

kk.     The negative media coverage, however, was becoming concerning. As a result, Old GM tasked its Product Investigations unit to examine the ignition switch defect. The Product Investigations unit typically was charged with solving significant engineering problems, both of customer satisfaction and product safety. Product Investigations Manager Doug Wachtel and his team examined early data from the field and found 14 incidents related to the ignition switch. Wachtel and company also tried to

recreate moving stalls themselves.  In this vein, Wachtel and Gay Kent drove a Cobalt around Old GM's property in Warren, Michigan.  Ms. Kent had a long and heavy key chain, and was able to knock the ignition from "run" to "accessory" simply by moving her leg so that her jeans caused friction against the fob.

ll.     The Product Investigations unit, in spite of its findings, concluded that the ignition switch problem was not of sufficient seriousness to warrant a recall.  At this time, Old GM knew that a defect existed in its vehicles, but it downplayed and denied the magnitude of the problem, and did nothing to disclose the issue to its customers.

mm.     The failure to act did not end here.  Around June 7, 2005, DeGiorgio was asked to propose a change to the ignition switch that would double the torque required to turn the switch.  DeGiorgio identified two possibilities.  First, he proposed using a switch under development for the Saturn Vue and the Chevrolet Equinox (the "GMT 191").  Because the GMT 191 switch was superior to the current ignition switch both electrically and mechanically, DeGiorgio referred to it as the "gold standard of ignition switches."  Second, DeGiorgio proposed redesigning the ignition switch already in use.  Part of DeGiorgio's plan for this latter option included adding a second detent plunger.

nn.     On June 14, 2005, Old GM's Vehicle and Process Integration Review (VAPIR) team for the Cobalt met to discuss potential solutions to the moving stall issue.  Proposed solutions were categorized as either "short-term" or "long-term."  As a proposed short-term solution, Old GM engineers proposed using a smaller key ring and replacing the slotted key head with one that contained a hole.  (This was the same solution proposed by David Thrush during the November 2004 PRTS.)  Old GM's long-term solution centered on DeGiorgio's proposal to replace the ignition switch with the

GMT 191, or "gold standard" switch.  The GMT 191 would allegedly double the torque required to turn the ignition.  Old GM engineers proposed to implement the new switch beginning with model year 2007 or 2008 vehicles at a cost of just $1.00 per vehicle, plus tooling costs.

oo.     Shortly after its June 14, 2005 meeting, the Cobalt VAPIR team approved a "fix" for existing customers that would address the slotted key heads: a plug capable of insertion into the key head to eliminate the slot along the head of the key.  The VAPIR team also approved a redesign of keys for future model year vehicles to eliminate the slot design (a change that was not implemented).  Old GM then issued a Preliminary Information to its dealers, explaining that the key insert was available for 2005 Chevrolet Cobalt vehicles.  The key insert solution did not, however, address the core problem of low torque and the low placement of the ignition switch on the steering cylinder.  Indeed, Old GM's engineers regarded the key head design change as only a temporary solution— or, as one Old GM engineer described it, a "band-aid."  Old GM's failure to take decisive action to address the defect would soon prove fatal.

pp.     On June 29, 2005, an Old GM customer filed the following complaint (and succinctly identified the safety risk) regarding a 2005 Cobalt and its tendency to lose power during ordinary driving scenarios:

> Dear Customer Service:
>
> This is a safety recall issue if ever there was one. . . . The problem is the ignition turn switch is poorly installed.  Even with the slightest touch, the car will shut off while in motion.  I don't have to list to you the safety problems that may happen, besides an accident or death, a car turning off while doing a high speed . . . .

qq.     Just weeks later, in July of 2005, Old GM received notice that Amber Marie Rose, a 16 year old resident of Clinton, Maryland, was killed in an accident after her 2005 Chevrolet Cobalt drove off the road and struck a tree head-on.  The airbags in Ms. Rose's Cobalt did not deploy during this frontal collision.  NHTSA opened an investigation and hired Calspan Crash Data Research to conduct a Special Crash Investigation (SCI).  The SCI determined that the ignition switch in Ms. Rose's Cobalt was in the "accessory" position at the time of collision.  Upon information and belief, Old GM subsequently entered into a confidential settlement agreement with Ms. Rose's mother.

rr.     In December 2005, Old GM issued a Technical Service Bulletin (05-02-35-007) (the "TSB").  The TSB applied to 2005-2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-2006 Pontiac Pursuits, 2006 Pontiac Solstices, and 2003-2006 Saturn Ions, all of which contained uniformly designed defective ignition switches.  The TSB, which was issued only to Old GM dealers, was captioned, "Information on inadvertent Turning of Key Cylinder, Loss of Electrical System and no DTCs."  The TSB stated:

> There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.
>
> The concern is more likely to occur if the driver is short and has a large and/or heavy key chain.  In these cases, this condition was documented and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down.  This is more likely to happen to a person who is short, as they have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause.  The customer should be advised of this potential and should take steps to prevent it—such as removing unessential items from their key chain. . . .

ss.    As with its prior bulletin regarding the Subject Vehicles, the information Old GM provided in the TSB was false and misleading.

tt.    For example, the TSB intentionally omitted use of the word "stall," which was language Old GM knew was a red flag to regulators.  Old GM Quality Service Manager Steven Oakley, who drafted the December 2005 TSB, stated that the term "stall" is a "hot" word that Old GM did not use in TSBs because it may raise a concern about vehicle safety and thereby suggest that a recall, not a TSB, is appropriate.  Old GM personnel also stated that "there was concern about the use of 'stall' in a TSB because such language might draw the attention of NHTSA."[4]  Rather than describe the defective condition accurately, Old GM used language to obfuscate the problem at hand.

uu.    Further, the TSB fails to mention that an ignition switch that turns to the "accessory" or "off" position will disable the airbags, cut the engine, and disable power steering and brakes.

vv.    At the time it issued the TSB, Old GM knew that power failure incidents were happening to drivers of all heights and sizes, and to drivers with no extra items on their key chains.

ww.    Between November 2005 and March 2006, Old GM learned of at least three incidents in which operators of Chevrolet Cobalt vehicles lost control of the vehicle and experienced front-end collisions in which the airbags of the vehicle failed to deploy. In two of these incidents, data obtained from the vehicle's Sensory Diagnostic Module (SDM) showed that the vehicle was in the "accessory" position just before impact.  Old

---

[4] Valukas Report at 93 & n.392.

GM opened internal investigations into each of these three incidents but generally did nothing.

xx.    On April 24, 2006, Ray DeGiorgio approved plans to redesign the ignition switch in order to improve the switch's torque performance.  The redesign plan, *inter alia*, included a new detent plunger and spring in the detent plunger.

yy.    In spite of this redesign, Old GM did not issue a corresponding change of the ignition switch's part number.  Upon information and belief, Old GM neglected to change the part number in an effort to conceal its redesign of the ignition switch. Government regulators would later explain that this action—concealing the part change by applying the same part number to the redesigned ignition switches—prevented NHTSA from discovering the ignition switch defect for years.

zz.    Indeed, New GM CEO Mary Barra acknowledged in April 2014 that the failure to change the part number for the ignition switches was inappropriate and did not meet industry standard behavior.

aaa.    Furthermore, and in spite of the redesign, the ignition switches continued to fall short of Old GM's design specifications for torque performance.  The redesigned ignition switches therefore continued to be defective as designed and manufactured.

bbb.    In October 2006, Old GM again updated the TSB (05-02-35-007) to include additional model years: the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Chevrolet Cobalt, and 2007 Pontiac Solstice and G5.  These model year vehicles possessed the same safety-related defects as the vehicles included in the original TSB.

ccc.    In August 2007, Old GM met with Continental to review the SDM data from a crash of a 2005 Chevrolet Cobalt where the airbags failed to deploy, resulting in a

fatal injury.   By this time, Continental had knowledge of the safety-related defects discussed in this Complaint.   Neither Old GM nor Continental shared the results of this meeting with relevant regulatory authorities or the public.

ddd.   The next month, the Chief of the Defect Assessment Division within the Office of Defects Investigation of NHTSA proposed that the agency investigate "frontal airbag non-deployment in 2003-2006 Chevrolet Cobalt/Saturn Ion."   The proposal was prompted by a "pattern of reported non-deployments" that were "first observed in early 2005."   According to the Chief of the Defect Assessment Division, and in response to inquiries from NHTSA, GM "indicat[ed] that they see no specific pattern."

eee.   At this time, Old GM knew of the problems related to airbag non-deployment in the Chevrolet Cobalt vehicles and, according to this email, was deliberately misleading NHTSA about its knowledge of these problems.   Old GM knew, for example, that its airbag systems would become disabled when the ignition switch to a vehicle moved from the "run" position to the "accessory" or "off" position during normal operation of the vehicle.   All the while, however, Old GM also knew that NHTSA believed that in most, if not all vehicles, the airbag systems were operable for several seconds following a power loss.   Thus, Old GM knew that NHTSA was mistaken and did nothing to correct NHTSA's mistaken belief.

fff.   What is more, between December 2006 and October 2007, Old GM learned of at least five fatal accidents involving frontal collisions in Subject Vehicles wherein the airbags failed to deploy.

ggg.   The Acting Administrator of NHTSA, David Friedman, testified in 2014 that Old GM withheld data from NHTSA regarding the likelihood of airbag non-

deployment in the Subject Vehicles during this time period.  Old GM withheld this data

in an effort to thwart any investigation by NHTSA and to avoid a recall of the Subject

Vehicles.

      hhh.    Old GM's concealment and obfuscation was not limited to its dealing with

NHTSA.  In a 2008 internal presentation, Old GM instructed its employees to avoid using

the following "judgment" words:

| | | |
|---|---|---|
| always | detonate | maniacal |
| annihilate | disemboweling | mutilating |
| apocalyptic | enfeebling | never |
| asphyxiating | evil | potentially-disfiguring |
| bad | evicscerated [sic] | power [sic] keg |
| Band-Aid | explode | problem |
| big time | failed | safety |
| brakes like an "X" car | flawed | safety related |
| cataclysmic | genocide | serious |
| catastrophic | ghastly | spontaneous combustion |
| Challenger | grenadelike | startling |
| chaotic | grisly | suffocating |
| Cobain | gruesome | suicidal |
| condemns | Hindenburg | terrifying |
| Corvair-like | hobbling | Titanic |
| crippling | horrific | tomblike |
| critical | impaling | unstable |
| dangerous | inferno | widow-maker rolling sarcophagus (tomb or coffin) |
| deathtrap | Kevorkianesque | Words or phrases with biblical connotation |
| debilitating | lacerating | |
| decapitating | life-threatening | |
| defect | maiming | |
| defective | mangling | |

      iii.    Instead of using commonsense language, Old GM employees were

advised in Orwellian fashion to use specific words to avoid disclosure of the material

safety risks associated with Old GM products, and in so doing furthered the cover-up and

fraud through intentional (and misleading) word substitutions, such as:

- "Issue, Condition [or] Matter" instead of "**Problem**"

- "Has Potential Safety Implications" instead of "**Safety**"

- "Does not perform to design" instead of "**Defect/Defective**"

jjj.     Old GM knew its defective vehicles were killing and/or maiming its customers, but it nonetheless instructed its employees to avoid words like "defect" or "safety"—words that accurately described the issues.  Instead of publicly admitting the dangerous safety defects in its vehicles, Old GM repeatedly blamed accidents on driver error.

kkk.     Upon information and belief, Old GM's policy against "judgment" words, and linguistic obfuscation in general, was adopted and continued on by New GM after the bankruptcy sale.

> b.     *New GM Continues to Fraudulently Conceal the Ignition Switch Defect After the Bankruptcy Sale*

48.     New GM continued its business with full knowledge of Old GM's awareness and concealment of the defects with the ignition switch and airbag system, and with knowledge of Old GM's failure to disclose those defects to the public—or, for that matter, to the Bankruptcy Court.  Had New GM acted when it acquired knowledge of the ignition switch defect, Dennis Ward would likely not have been involved in an accident on March 27, 2014—almost five years after New GM emerged from bankruptcy.

49.     Rather than promptly recalling the Subject Vehicles, however, New GM fraudulently concealed the existence of the safety defects in the Subject Vehicles.  Moreover, New GM continued to manufacture vehicles with the ignition switch defect after it emerged from bankruptcy.  Indeed, hundreds of thousands of the vehicles manufactured by New GM have since been recalled for defective ignition switches.

29

50.     In March 2010, GM recalled nearly 1.1 million Cobalt and Pontiac G5 models for faulty power steering issues.   In recalling these vehicles, GM recognized that loss of power steering, standing alone, was grounds for a safety recall.   Yet, incredibly, GM claims it did not view the ignition switch defect (which disables power steering as well as other functions) as a "safety issue," but only a "customer convenience issue."   Despite its knowledge of the ignition switch defect, GM did not include the ignition switch defect in this recall.   Further, although the Chevrolet HHR used the same steering system as the Cobalt and Pontiac G5 (and had the same ignition switch defect), GM did not recall any Chevrolet HHR vehicles at this time.

51.     Just days after the power steering recall, GM's deadly ignition switch took another life.   On March 10, 2010, Brooke Melton was driving her 2005 Chevrolet Cobalt on a two-lane highway in Paulding County, Georgia.   While she was driving, her key turned from the "run" to the "accessory/off" position causing her engine to shut off.   After her engine shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane, where it collided with an oncoming car.   Ms. Melton was killed in the crash.   And the deaths did not stop here.

52.     On December 31, 2010, in Rutherford County, Tennessee, a 2006 Cobalt traveled off the road and struck a tree.   Although there was a frontal impact in this incident, the front airbags failed to deploy.   The download of the SDM later showed the key was in the "accessory/off" position at the time of the crash.   GM received notice of this incident, opened a file, and referred to it as the "Chansuthus" incident.

53.     Also on December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb.   Although there was a frontal impact, the front airbags failed to deploy.   GM received notice of this incident, opened a file, and referred to it as the "Najera" incident.

54.     On March 22, 2011, Ryan Jahr, a GM engineer, downloaded the SDM from Brooke Melton's Cobalt.  The information from the SDM download showed that the key in the Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash.  On June 24, 2011, Brooke Melton's parents filed a lawsuit against GM.

55.     In August 2011, GM assigned Engineering Group Manager Brian Stouffer to assist with a Field Performance Evaluation (FPE) that it had opened to investigate frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s.

56.     On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree.  Although the vehicle sustained a frontal impact, the front airbags did not deploy.  A subsequent download of the SDM showed that the ignition key was in the "accessory/off" position at the time of impact.  GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.

57.     In early 2012, Brian Stouffer asked Jim Federico (who reported directly to Mary Barra at the time) to oversee the FPE investigation into frontal airbag non-deployment incidents. Federico was named the "executive champion" for the investigation to help coordinate resources.

58.     In May 2012, GM engineers tested the torque on numerous ignition switches of 2005-2009 Cobalt, 2007-2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Ion vehicles that were parked in a junkyard.  The results of these tests showed that the torque required to turn the ignition switches from the "run" to the "accessory/off" position in most of these vehicles did not meet GM's minimum torque specification requirements.  Even vehicles from model years 2008-2009, after Ray DeGiorgio approved the redesign of the ignition switch, by and large failed to meet GM's torque specifications.  These results were reported to Stouffer and other members of the FPE.

59.     In September 2012, Stouffer requested assistance from a "Red X Team" as part of the FPE investigation.  The Red X Team was a group of engineers within GM assigned to find the root cause of the airbag non-deployments in front-end accidents involving Chevrolet Cobalts and Pontiac G5s.  By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the front-end accidents was the defective ignition system.

60.     Indeed, Mr. Stouffer acknowledged in his request for assistance that the Chevrolet Cobalt could experience a power failure during an off road event, or if the driver's knee contacted the key and turned off the ignition.  Mr. Stouffer further acknowledged that such a loss of power could cause the airbags not to deploy.  In other words, Mr. Stouffer knew full well the reasons for the airbag non-deployments, yet he requested additional assistance in order to stall and/or ignore the problem.

61.     At this time, GM did not provide the information that it had developed during the FPE to NHTSA or the public.

62.     Under 49 C.F.R. § 573.6, GM had a duty in 2012, when it clearly was aware of the ignition switch defect, to disclose the defect in the Subject Vehicles.  Rather than comply with its legal obligations, GM continued to fraudulently conceal this defects from the public and the US government.

63.     Had GM complied with its obligations under § 573.6, a recall may have been implemented in 2012, and Dennis Ward's HHR may have been repaired prior to March 27, 2014.

64.     Acting NHTSA Administrator David Friedman recently stated, "at least by 2012, GM staff was very explicit about an unreasonable risk to safety" from the ignition switches in the Subject Vehicles.

65.     Mr. Friedman continued: "GM engineers knew about the defect.  GM lawyers knew about the defect.  But GM did not act to protect Americans from the defect."

66.     There is significant evidence that multiple in-house attorneys knew of and understood the ignition switch defect in and around 2012 and 2013.  These attorneys, including in-house lawyer Michael Milliken, negotiated settlement agreements with families whose loved ones had been killed and/or injured while operating a Subject Vehicle under circumstances that implicated the ignition switch defect.  In spite of their knowledge of the ignition switch defect, GM's attorneys concealed what they knew and neglected to question whether the Subject Vehicles should be recalled.  This quest to keep the ignition switch defect secret prolonged its ultimate discovery and contributed to added death and injury.

67.     During the FPE inquiry, GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

68.     Indeed, GM engineers identified several additional ways to actually fix the problem.  Unsurprisingly, these solutions echoed solutions that Old GM engineers had proposed years before, but had decided not to implement because of cost concerns.  GM engineers proposed adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the "run" position, and adding a push button to the lock cylinder to prevent it from slipping out of run.  GM rejected each of these ideas.

69.     The photographs below depict a GM engineer in the driver's seat of a Cobalt during the investigation of Cobalt stalling incidents.  Note the proximity of the driver's knee to the ignition key:



70.     These photographs show the dangerous position of the key in the lock module on the steering column, as well as the key with the slotted head, which allows the key fob to hang too low off the steering column.  GM engineers understood that the key fob can be impacted and pinched between the driver's knee and the steering column, and that this may cause the key to inadvertently turn from the "run" to the "accessory" or "off" position.  The photographs show why GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem, for such a step would not alleviate the possibility of impacting the key with a driver's knee.  The photographs also show why GM engineers believed that additional changes (such as the shroud) were necessary to fully fix the defects with the ignition switch.

71.     On October 4, 2012, there was a meeting of the Red X Team during which Jim Federico gave an update of the Cobalt airbag non-deploy investigation.  According to an email from Stouffer on the same date, the "primary discussion was on what it would take to keep the SDM active if the ignition key was turned to the accessory mode."   Again, GM engineers recognized that the SDM should remain active if the key is turned to the "accessory/off" mode, but GM took no action at this time to remedy the ignition switch defect or notify customers that the defect existed.

72.     During the October 4, 2012 meeting, Stouffer and the other members of the Red X Team also discussed "revising the ignition switch to increase the effort to turn the key from Run to Accessory."

73.     On October 4, 2012, Mr. Stouffer emailed Ray DeGiorgio and asked him to "develop a high level proposal on what it would take to create a new switch for service with higher efforts."  On October 5, 2012, DeGiorgio responded:

> Brian,
>
> In order to provide you with a HIGH level proposal, I need to understand what my requirements are.  what is the TORQUE that you desire?
>
> Without this information I cannot develop a proposal.

74.     On October 5, Stouffer responded to DeGiorgio's email, stating:

> Ray,
>
> As I said in my original statement, I currently don't know what the torque value needs to be.  Significant work is required to determine the torque.  What is requested is a high level understanding of what it would take to create a new switch.

75.     DeGiorgio replied to Stouffer the following morning:

> Brian,
>
> Not knowing what my requirements are I will take a SWAG at the Torque required for a new switch.  Here is my level proposal
>
> **Assumption is 100 N cm Torque.**
>
> - New switch design = Engineering Cost Estimate approx. $300,000
> - Lead Time = 18 – 24 months from issuance of GM Purchase Order and supplier selection.
>
> Let me know if you have any additional questions.

76.    Stouffer later admitted in a deposition that DeGiorgio's reference to "SWAG" was an acronym for "Silly Wild-Ass Guess."

77.    DeGiorgio's cavalier attitude exemplifies GM's approach to the safety-related defects that existed in the ignition switch and airbag system in the Subject Vehicles.  Rather than seriously addressing the safety-related defects, DeGiorgio's emails show he understood the ignition switches were contributing to the crashes and fatalities, and he could not care less.

78.    It is also obvious from this email exchange that Stouffer, who was a leader of the Red X Team, had no problem with DeGiorgio's cavalier and condescending response to the request that he evaluate the redesign of the ignition switches.

79.    On April 29, 2013, Ray DeGiorgio was deposed in Detroit, Michigan as part of the lawsuit brought by Brooke Melton's parents.  At his deposition, Mr. DeGiorgio was shown photographs of the differences between the ignition switch in Brooke's Cobalt and the ignition switch in the 2008 Cobalt (which DeGiorgio had redesigned without changing the part number).

80.    Mr. DeGiorgio was questioned about his knowledge of any differences in the ignition switches:

> Q.  And I'll ask the same question.  You were not aware before today that GM had changed the spring – the spring on the ignition switch had been changed from '05 to the replacement switch?
>
> MR. HOLLADAY:  Object to the form.  Lack of predicate and foundation.  You can answer.
>
> THE WITNESS:  I was not aware of a detent plunger switch change.  We certainly did not approve a detent plunger design change.
>
> Q.  Well, suppliers aren't supposed to make changes such as this without GM's approval, correct?
>
> A.  That is correct.
>
> Q.  And you are saying that no one at GM, as far as you know, was aware of this before today?

MR. HOLLADAY:  Object.  Lack of predicate and foundation.  You can answer.

THE WITNESS:  I am not aware about this change.

(DeGiorgio Deposition, pp. 151-152).

81.     Mr. DeGiorgio's testimony left no doubt that he unequivocally disclaimed any knowledge of any change in the ignition switch in the 2005-2010 Cobalts.  Mr. DeGiorgio, however, authorized the redesign to the ignition switches in 2006.  Thus, the testimony provided in 2013 was knowingly false and intended to mislead.

82.     Mr. DeGiorgio also provided the following testimony about the ignition switch supplier, Delphi:

> Q.  And there weren't any changes made – or were there changes made to the switch between '05 and 2010 that would have affected the torque values to move the key from the various positions in the cylinder?
>
> A.   There was one change made to the resistor in '08, but that should not have affected the torque or the displacement of the switch.
>
> I can restate this way:  There was an electrical change made in '08, but not a mechanical change – at least there were no official changes, mechanical changes, made to the switch that I know of.
>
> Q.  When you say no official, could there be unofficial changes made?
>
> A.  I'm not saying that there was, I'm just saying if there was something changed at the supplier side, we were not aware of it and we did not approve it, okay?

(DeGiorgio Deposition, pp. 57-58).

83.     Mr. DeGiorgio's testimony left no doubt that he had spoken with Delphi employees and that they confirmed that there were no changes made to the ignition switch in 2005-2010 Cobalts.  This testimony, like the testimony set forth above, was knowingly false and intended to mislead.

84.     GM's years-long internal "investigation" into the Subject Vehicles—as well as all of the GM documents that were included in the "Purchased Assets" from the bankruptcy sale—

provided GM with actual knowledge, long before Dennis Ward's March 2014 injury, of the ignition switch defects in the Subject Vehicles.  Notwithstanding these facts, GM continued to fraudulently conceal the nature and extent of the defects from the public, inducing customers, including Dennis Ward, to purchase Subject Vehicles with no knowledge of the existence of these serious and uniform defects, and no provision to avoid the safety risks of operating the Subject Vehicle.  Mr. DeGiorgio's deposition testimony in 2013, while appalling, is simply emblematic of the cover-up that was long-running and company-wide.

85.     Moreover, throughout the entirety of its corporate existence, GM received numerous and repeated complaints of moving engine stalls and/or power failures in the Subject Vehicles.  These complaints are yet more evidence that GM was fully aware of the ignition switch defect and should have timely announced a recall much sooner than it did.

86.     GM was aware of these problems year after year and nationwide, as reflected not only by the internal documents reflecting knowledge and cover-up at high levels, but also in thousands of customer complaints recorded in GM's internal complaint logs and documents. GM received and reviewed complaints of safety issues from customers with Subject Vehicles in nearly every state nationwide.  Documents produced by GM pursuant to Order No. 12 in *In re General Motors LLC Ignition Switch Litigation* (14-MC-2543, Dkt. No. 46) show that GM was aware of customer complaints of stalling Subject Vehicles in many of these states and ultimately did nothing about them.  These complaints, of course, are in addition to the multiple non-deploy fatalities of which GM became aware and even investigated from July 2009 to the present.

## C.     GM Issues a Recall—Ten Years Too Late

87.     As pressure from the Melton litigation mounted, GM executives finally felt compelled to act.  On January 31, 2014, GM's Field Performance Review Committee and

Executive Field Action Decision Committee ("EFADC") finally ordered a recall of *some* Subject Vehicles.

88.     On February 7, 2014, GM, in a letter from Director of Product Investigations and Safety Regulations Carmen Benavides, informed NHTSA that it was conducting a recall of 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles.

89.     GM knew that this recall was insufficient in scope.  Indeed, GM knew that the same defective ignition switches installed in the Cobalt and G5 vehicles were installed in Chevrolet HHR, Pontiac Solstice, Saturn Ion, and Saturn Sky vehicles.  But GM did not recall these vehicles on February 7.

90.     On February 19, 2014, a request for timeliness query of GM's recall was sent to NHTSA by the Center for Auto Safety, a non-profit auto safety group.  The timeliness query pointed out that GM had failed to recall all of the vehicles with the defective ignition switches.

91.     The February 19, 2014 timeliness query also asked NHTSA to investigate GM's failure to fulfill its legal obligation to report the safety defects in the Subject Vehicles within five days of discovering the defect—a requirement of applicable federal law.

92.     On February 24, 2014, GM informed NHTSA it was expanding the recall to include 2006-2007 model year Chevrolet HHR and Pontiac Solstice, 2003-2007 model year Saturn Ion, and 2007 model year Saturn Sky vehicles.

93.     GM included an Attachment to the February 24, 2014 letter.   In the Attachment, GM, for the first time, admitted that it authorized a change in the ignition switch in 2006. Specifically, GM stated:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics. The approved changes included, among other things, the use of a

new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch. GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year.

94.     Public criticism in the wake of GM's piecemeal recalls was withering. On March 17, 2014, Mary Barra issued an internal video, which was broadcast to employees. In the video, Ms. Barra acknowledged:

> Scrutiny of the recall has expanded beyond the review by the federal regulators at NHTSA, the National Highway Traffic Safety Administration. As of now, two congressional committees have announced that they will examine the issue. And it's been reported that the Department of Justice is looking into this matter. . . . These are serious developments that shouldn't surprise anyone. After all, something went wrong with our process in this instance and terrible things happened.

95.     The public backlash continued and intensified. On March 28, 2014, GM again expanded the ignition switch recall to cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky in the United States. This third expansion of the ignition switch recall covered an additional 824,000 vehicles in the United States and raised the number of recalled vehicles to 2,191,146.

96.     Unfortunately for Plaintiff Dennis Ward, his 2009 Chevrolet HHR's ignition switch failed one day prior to GM's recall of the 2009 model year HHR.

97.     GM's recalls of the Subject Vehicles were not only untimely, they are completely insufficient to correct the safety-related defects in the Subject Vehicles.

98.     To address the safety defect, GM is replacing the defective ignition switches in the Subject Vehicles with a new ignition switch, and providing new keys without slotted key heads. These repairs fail to address the design defect that causes the key fob/chain to hang too low on the steering column, and fails to address the defective airbag system, which disables the

airbag immediately when the engine shuts down.  Thus, even when the ignition switches and keys are replaced, a defective condition will still exist in the Subject Vehicles and the potential will continue to persist for a driver to contact the key chain and inadvertently turn the key from the "run" to the "accessory/off" position.

99.     GM notified owners and lessees of the Subject Vehicles by letter beginning in late February of 2014.  Dennis Ward received his recall letter sometime in mid-April of 2014— weeks after his accident.  GM's recall letter minimizes the risk of the ignition switch defect, indicating that ignition problems would occur only "under certain conditions" and emphasizing that the risk increases if the "key ring is carrying added weight . . . or your vehicle experiences rough road conditions."

100.     On May 16, 2014, GM agreed to a civil penalty of $35 million—the maximum permitted by law—for its failure to timely notify NHTSA of the ignition switch defect.  As part of its agreement, GM agreed to implement numerous internal reforms to improve its response to product defect issues in the future.

101.     GM later terminated fifteen employees for their participation in the ignition switch cover-up.  Two of those employees, Design Release Engineer Ray DeGiorgio and Gary Altman, were intimately involved in the development—and concealment—of the defective ignition switches, and both were longtime employees of Old GM and New GM.

102.     In the months that followed the initial ignition switch recalls, GM finally began to acknowledge that it has been ignoring safety concerns in its vehicles for years.  To date, GM has announced over 35 recalls since February 2014, and it has recalled over 26.6 million vehicles in the past eight months.  This number is staggering; indeed, no car manufacturer has ever recalled as many vehicles in a single year.

**D.     GM Creates an Inadequate Settlement Fund**

103.    GM has acknowledged that the ignition switch defect has caused at least thirteen deaths and over 50 accidents.  Independent safety groups put this number far higher: the Center for Auto Safety, for example, estimates that there have been 303 deaths associated with the Saturn Ion and Chevrolet Cobalt vehicles alone.  The actual number of deaths and accidents for all Subject Vehicle models is expected to be significantly higher than GM's estimate.[5]

104.    In April 2014, under intense scrutiny from Congress and the Department of Justice, Mary Barra announced that GM would retain attorney Kenneth Feinberg to implement a claims facility to amicably resolve personal injury and wrongful death claims associated with the ignition switch defect.  Ms. Barra's announcement was greeted with much fanfare on Capitol Hill and in the press.

105.    On June 30, 2014, Mr. Feinberg unveiled the GM Ignition Compensation Claims Resolution Facility (hereinafter the "GM Claims Facility" or "Facility").  The GM Claims Facility offers compensation to three categories of victims:

- Those who were killed in an accident involving certain Subject Vehicles;

- Those who suffered a "Category One" injury in an accident involving certain Subject Vehicles.  A Category One injury is defined as a "quadriplegic injury, paraplegic injury, double amputation, permanent brain damage requiring continuous home medical assistance, or pervasive burns encompassing a substantial part of the body"; and

---

[5] Indeed, GM's own Claims Resolution Facility has been accepting claims for little over ten weeks and has already determined that the ignition switch is responsible for 27 deaths and 25 injuries.  By current estimate, the Facility has yet to review over 1,000 filed claims, and additional claims may be filed for another ten weeks.  *See* GM Ignition Compensation Claims Resolution Facility Overall Program Statistics, http://www.gmignitioncompensation.com/docs/programStatistics.pdf (last visited Oct. 14, 2014).

- Those who suffered a "Category Two" injury in an accident involving certain Subject Vehicles.  A Category Two injury is generally defined as an injury requiring one or more nights of hospitalization within 48 hours of the accident.

106.    In addition to these injury thresholds, the GM Claims Facility does not treat all Subject Vehicles equally.  Rather, individual claimants injured or killed in accidents involving any Subject Vehicle of model year 2007 or earlier are eligible for compensation.  Claimants in Subject Vehicles whose model year is 2008 or later, however, are eligible only upon proof that (i) the original ignition switch was replaced prior to the accident in question, and (ii) the replacement switch was one bearing Part Number 10392423.

107.    According to the GM Claims Facility FAQ, this distinction makes sense because Subject Vehicles of model year 2007 and earlier "had defective ignition switches installed at the time of manufacture."  Subject Vehicles whose model year is 2008 or later, however, allegedly "did not have defective ignition switches installed during manufacture."  GM has thus taken the position (and excluded from eligibility) those Subject Vehicles that were manufactured with the ignition switches as redesigned by Ray DeGiorgio in 2006.  In other words, GM (and the Facility it implemented) denies that the ignition switches were still defective following DeGiorgio's redesign.

108.    Thus, GM refuses to acknowledge what GM's engineers have long known—the defect in the ignition switches is not limited to inadequate torque performance, but also includes the low placement of the ignition on the steering cylinder as well as the airbag system that is disabled when the ignition is in the "accessory" or "off" position.  GM's FPE team recognized

these essential aspects of the safety defect as recently as 2012 when they proposed placing a shroud over the ignition and/or moving the ignition higher on the steering column.

109.    Even if the ignition switch defect were purely an issue of inadequate torque performance, however, the evidence shows that the ignition switches were defective even after DeGiorgio's 2006 redesign.  In May of 2012, GM's FPE team tested the ignition switches in dozens of Subject Vehicles, many of them model years 2008 and 2009.  In these tests, GM engineers found that the ignition switches for these 2008 and 2009 model year Subject Vehicles by and large failed to meet GM's torque specifications for the ignition switch.

110.    Further, GM's own investigation into airbag non-deployment events in Chevrolet Cobalt vehicles identified over 250 non-deploy crashes involving 2008-2010 Cobalts.  Upon information and belief, GM has knowledge of numerous non-deploy incidents in Subject Vehicles of model year 2008 and later in which the ignition switch was not replaced prior to the relevant incident.  Although these vehicles have thus exhibited evidence of the ignition switch defect, they are not eligible for compensation from the Claims Facility.

111.    What is more, until GM recalled 2008 and later model year Subject Vehicles, it had never notified the owners of those vehicles that they should remove all items from their key chains and/or avoid jarring road conditions or contacting the ignition key with one's knee.  GM knew that any of these scenarios could cause the ignition switches in later model year Subject Vehicles to fail, but it did nothing to notify its customers of these facts.

112.    In truth, the problems in earlier model year Subject Vehicles and later model year Subject Vehicles are the same.  The ignitions are placed dangerously low on the steering column, and the torque required to hold the ignition key in place under normal driving conditions is insufficient.

113.     This was certainly the case in Plaintiff Dennis Ward's HHR.  On March 27, 2014, at the time of the accident, Mr. Ward's key chain contained numerous keys in addition to his HHR ignition key.  At this time, however, GM had not recalled the 2009 and later-year model HHRs, nor had it advised owners to remove extra items from the key chain and/or avoid driving across bumpy or jarring roadways.

114.     To demonstrate the ease with which his ignition switch could inadvertently move from the "run" position to the "accessory" or "off" position, Mr. Ward filmed the following video in his 2009 Chevrolet HHR, which shows that contact with the keys attached to the key chain unintentionally moves the key from the run to the off position and disables power to the vehicle:[6] http://youtu.be/c8uV5IEMwb8.

115.     To demonstrate the contrast between Mr. Ward's defective vehicle and a vehicle with a non-defective ignition switch, Mr. Ward and his son filmed a similar video, testing the switch in a 2012 Chevrolet Silverado.  To sharpen the contrast, Mr. Ward placed an abnormally large number of items on the Silverado's keychain, making it extra heavy.  As the video shows, the ignition switch remains in the "run" position under pressure: http://youtu.be/bMZrGI7_tcA.

116.     As these videos demonstrate, the ignition switch in Dennis Ward's 2009 Chevrolet HHR is defective.  It is incapable of withstanding ordinary and normal movement and/or pressure.  And when Mr. Ward's ignition switch inadvertently turned to the "accessory" or "off" position on March 27, 2014, it was because his switch was unable to hold the "run" position, either because the torque performance was inadequate or because the switch

---

[6] Mr. Ward filmed this video on or around August 25, 2014.  After his accident, Mr. Ward's vehicle was towed and he replaced most of the HHR's front paneling.  He did not repair the ignition switch or steering column, and has only lightly driven the car since.  The ignition switch in his HHR at the time of filming was the same ignition switch in his HHR at the time of manufacture and at the time of the accident.

inadvertently and unexpectedly moved while the vehicle traveled over rough or uneven roadway. The GM-created Claims Facility is therefore wrong to exclude later model years of Subject Vehicles on the theory that the ignition switches, following DeGiorgio's redesign, are not defective. These ignition switches are demonstrably defective.

117.    GM's arbitrary exclusion of these vehicles is simply an attempt to contain its liability—a tactic that contradicts GM CEO Mary Barra's public statements. In her April 1, 2014 testimony before Congress, Ms. Barra assured legislators and the public that

> General Motors want[s] to do the right thing for our customers, and that's why we feel this is an extraordinary situation. . . . [W]e will make the best decisions for our customers, recognizing that we have legal obligations and responsibilities as well as moral obligations. We are committed to our customers, and we are going to work very hard to do the right thing for our customers.

Ten weeks later, Ms. Barra continued with her public assurances, telling Congress that GM "want[s] to capture [in the Facility] every single person who has suffered serious physical injury or lost a loved one" as a result of the defective ignition switches.

118.    GM's assurances are cold comfort for individuals such as Dennis Ward. Instead of fulfilling its assurances, GM waited until June 30, 2014, after congressional and public pressure had significantly subsided, to announce an artificial distinction between vehicles that are recalled for precisely the same defect with precisely the same disastrous safety risks. GM's exclusion of Mr. Ward's vehicle and others like it is highly suspect and calls into question the commitment of GM to its victims and shows that the Claims Facility is not a viable remedy for many victims of GM's defective vehicles.

119.    As the linked video demonstrates, the ignition switch in Dennis Ward's 2009 Chevrolet HHR is defective. On March 27, 2014 this defect proved costly. Mr. Ward should have the option to seek fair and expeditious compensation through the GM-created Claims

Facility, but its protocols arbitrarily and unreasonably exclude his vehicle from eligibility. Once again, GM has offered half-measures where it should fully and completely rectify its past mistakes.

## V. Tolling of the Statute of Limitation

120.    Old GM sold the Chevrolet HHR at issue in this case over five years prior to the filing of this action. Any statutes of repose or limitation are tolled, however, because of New GM's fraudulent concealment of the ignition switch defect, and conduct equivalent to that required for a finding of willful and wanton conduct against GM.

121.    Further, GM was under a continuous duty to disclose to Plaintiff the true character, quality, and nature of the Subject Vehicles. GM actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiff reasonably relied upon GM's knowing and affirmative representations that its vehicles—including the Subject Vehicles—were safe. Based on the foregoing, GM is estopped from relying on any statutes of limitations in defense of this action.

122.    Further, Plaintiff had no realistic ability to discern that his 2009 Chevrolet HHR was defective until—at the earliest—the ignition switch defect caused a sudden unintended power failure. Even then, Plaintiffs had no reason to know the sudden loss of power was caused by a defect in the ignition switch because of GM's active concealment of the ignition switch defect.

## VI. Claims for Relief

### Claim I:  Negligence

123.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

124.    This Claim is brought under Arizona law.

125.    GM was negligent in designing, inspecting, testing, manufacturing, assembling, marketing, selling, and providing warnings for the Chevrolet HHR, as set forth in the paragraphs above.   To the extent that Old GM designed, inspected, tested, manufactured, assembled, marketed, sold, and provided warnings for the Chevrolet HHR, GM assumed liability for Old GM's negligence and therefore stands in Old GM's shoes for purposes of negligence liability.

126.    GM had a duty to ensure that its vehicles, and those for which it had assumed liability, were reasonably safe to operate and did not contain defective components.   When GM learned that the 2009 Chevrolet HHR contained a defective component, it had a duty to warn Plaintiff of the existence of the defect.

127.    GM's negligence proximately caused the damages sustained by Dennis Ward, as set forth herein, thus rendering GM liable for compensatory and punitive damages.   GM is further liable for fair and reasonable damages for pain and suffering, medical expenses, and/or damages as may be determined by the Court or the jury, as well as costs, expenses, and reasonable attorneys' fees.

*Claim II:  Strict Liability*

128.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

129.    This Claim is brought under Arizona law.

130.    GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the Chevrolet HHR, and its components.   To the extent Old GM

designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the Chevrolet HHR, however, GM assumed liability for Old GM's conduct and therefore stands in Old GM's shoes for purposes of strict liability.

131.    GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the ignition switch system that was selected and installed in the Chevrolet HHR.   To the extent Old GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the ignition switch system that was selected and installed in the Chevrolet HHR, GM assumed liability for Old GM's conduct and therefore stands in Old GM's shoes for purposes of strict liability.

132.    GM had a legal duty to design, inspect, test, manufacture, and assemble the Chevrolet HHR so that it would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use.   To the extent Old GM had a legal duty to design, inspect, test, manufacture, and assemble the Chevrolet HHR so that it would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use, GM assumed liability for Old GM's conduct and therefore stands in Old GM's shoes for purposes of strict liability.

133.    Among other things, the 2009 Chevrolet HHR is not crashworthy, is defective, and is unreasonably dangerous and unsafe for foreseeable users and occupants in each of the following particulars:

> (a)    it has an ignition switch that allows the HHR to stall or lose engine power, power steering, and/or power braking while in normal and foreseeable operation;

(b)      it has an ignition that is placed in a position so that it is common and foreseeable for a driver to impact the ignition with his or her knee, thereby moving the ignition switch from the "run" to the "accessory" or "off" position; and

(c)      it has front airbags that do not deploy when the ignition is in the "accessory" or "off" position.

134.   The defective nature of the Chevrolet HHR was the proximate cause of Dennis Ward's damages, as set forth herein, thus rendering GM strictly liable for compensatory and punitive damages, fair and reasonable damages, and damages as may be determined by the Court or jury, as well as for costs, expenses, and reasonable attorneys' fees.

***Claim III:  Fraud and Fraudulent Concealment***

135.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

136.   This Claim is brought under Arizona law.

137.   GM intentionally concealed material facts from the Mr. Ward, NHTSA, and the public in general, and it continues to do so today.  GM knew that the Subject Vehicles, including the Chevrolet HHR, were designed and manufactured with ignition switch defects, but GM concealed those material facts.  Although the Subject Vehicles contain safety-related defects about which GM knew, or should have known, GM recklessly concealed that information from consumers in the United States.  Those consumers, including the Mr. Ward, had no knowledge of the safety-related defects.

138.   GM had a duty to disclose the facts to Mr. Ward, the public who owned defective GM vehicles, and NHTSA, but failed to do so.

139.     GM knew that Dennis Ward had no knowledge of the concealed facts, and that he did not have an equal opportunity to discover the concealed facts.   GM was in a position of superiority over Mr. Ward.   Indeed, Mr. Ward trusted GM not to allow defective vehicles for which it was responsible to remain in the marketplace.   Mr. Ward further trusted GM to warn of defects and to recall defective vehicles.

140.     By failing to disclose these material facts, GM intended to hide information regarding the defect, mislead, avoid suspicion, or prevent further inquiry into the matter by NHTSA, Mr. Ward, and the public in general.   GM further intended to induce NHTSA not to recall Mr. Ward's Chevrolet HHR, as well as other Subject Vehicles, in order to reduce its eventual financial exposure.

141.     Mr. Ward reasonably relied on GM's nondisclosure, and reasonably but unknowingly continued to use the Chevrolet HHR until the date of the accident.

142.     Mr. Ward would not have purchased the Chevrolet HHR had he known of the ignition switch defect.

143.     GM reaped the benefit of the sales and leases from the Subject Vehicles because it did not disclose the defects to the public and to NHTSA.   Additionally, in not disclosing the Subject Vehicles' defects, GM prevented any meaningful investigation of numerous accidents that were likely the result of those defects.   Further, because GM had not placed this matter before NHTSA or the public, cars and components in those other similar accidents were disposed of without the appropriate and adequate investigation.

144.     As a direct and proximate result of GM's wrongful conduct and fraudulent concealment, Dennis Ward suffered damages described herein.

145.    GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Mr. Ward, such that punitive damages are appropriate.

**Claim IV:  Violation of the Consumer Fraud Act**

146.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

147.    This Claim is brought under Arizona law.  *See* ARIZ. REV. STAT. § 44-1521 *et seq*.

148.    Plaintiff and GM are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA").  ARIZ. REV. STAT. § 44-1521(6).

149.    Plaintiff's 2009 Chevrolet HHR is "merchandise" within the meaning of the Arizona CFA.  ARIZ. REV. STAT. § 44-1521(5).

150.    The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . misrepresentation, concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  ARIZ. REV. STAT. § 44-1522(A).

151.    Plaintiff Dennis Ward purchased his 2009 Chevrolet HHR used in 2012.  At this time, GM was well aware of the ignition switch defect that plagued this vehicle.  Rather than disclosing this defect, however, GM concealed it, misrepresented facts, and otherwise suppressed information to which Plaintiff was entitled.

152.    GM knew or should have known that its acts of concealment, obfuscation, suppression, and misrepresentation regarding the ignition switch defect violated the Arizona CFA.

153.    Had Plaintiff known of the ignition switch defect in the 2009 Chevrolet HHR, and GM's callous disregard for safety, Plaintiff either would have paid less for the vehicle or would not have purchased it at all.  Thus, Plaintiff did not receive the benefit of his bargain as a result of GM's misconduct, and has suffered ascertainable loss because of GM's misrepresentations.

154.    Plaintiff seeks monetary relief against GM in an amount to be determined at trial. Plaintiff also seeks punitive damages because GM engaged in aggravated and outrageous conduct with an evil mind.  Plaintiff further seeks costs, expenses, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## VII.   **Damages**

155.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

156.    Plaintiff's bodily injuries were proximately caused by Defendant's conduct. Accordingly, Plaintiff is entitled to reasonable and proper compensation for the following legal damages:

        a.    past and future medical expenses and;

        b.    past and future pain and suffering;

        c.    past and future loss and impairment of earnings;

        d.    loss of enjoyment of life; and

        e.    loss of function.

157.    Plaintiff seeks actual and punitive damages to be awarded by the jury in an amount in excess of the minimum jurisdictional limits of this Court.

## VII.   **Punitive Damages**

158.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

159.    Plaintiff would further show that the clear and convincing evidence in this case will show that GM consciously or deliberately engaged in oppression, fraud, wantonness, and/or malice in concealing the defect in the Subject Vehicle and failing to recall the vehicle in a timely manner.  GM had actual, subjective awareness of the risk involved but nevertheless proceeded with indifference to the rights, safety, or welfare of others, including Plaintiff.  Therefore, punitive damages are sought and should be assessed against the Defendant.

**WHEREFORE**, Plaintiff, Dennis Ward, respectfully demands as follows:

1.    For judgment against Defendant General Motors LLC.

2.    For compensatory damages against Defendant in such amounts as the trier of fact shall deem just, fair and equitable, including but not limited to:

a.    Past and future medical expenses;

b.    Past and future loss and impairment of earnings;

c.    Loss of enjoyment of life;

d.    Past and prospective pain and suffering;

e.    Loss of function; and

f.    Prospective medical care and medication costs.

3.    For punitive damages against Defendants for willful and wanton conduct, gross negligence, and fraudulent concealment of the ignition switch defect for a period of five years' time.

4.    For pre-judgment and post-judgment interest;

5.    For his costs expended herein, including reasonable attorneys' fees;

Case 1:14-cv-08317-JMF   Document 1   Filed 10/17/14   Page 55 of 55

5.      Leave to amend this Complaint to conform to the evidence produced at trial; and

7.      Any and all other relief to which Plaintiff may appear entitled.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.


Dated:          October 17, 2014                    Respectfully submitted,

                                                     WEITZ & LUXENBERG, P.C.

                                                     By:  __/x/ *James J. Bilsborrow*__
                                                           James J. Bilsborrow

                                                     Robin L. Greenwald
                                                     *rgreenwald@weitzlux.com*
                                                     James J. Bilsborrow
                                                     *jbilsborrow@weitzlux.com*
                                                     WEITZ & LUXENBERG, P.C.
                                                     700 Broadway
                                                     New York, NY 10003
                                                     Telephone: (212) 558-5000
                                                     Facsimile: (646) 293-7937

                                                     *Attorneys for Plaintiff*