UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION    14-MD-2543 (JMF)

*This Document Relates To:*                      OPINION AND ORDER
*Ward v. General Motors LLC, 14-CV-8317 (JMF)*
------------------------------------------------------------------------x

USDC SDNY / DOCUMENT / ELECTRONICALLY FILED / DOC #:_____ / DATE FILED: 06/09/2017

JESSE M. FURMAN, United States District Judge:

**[Regarding the Parties' Motions *in Limine* and the
Admissibility of Plaintiff's Other Similar Incident Evidence]**

The next bellwether trial in this multidistrict litigation ("MDL"), brought by Plaintiff Dennis Ward in connection with his accident while driving his 2009 Chevrolet HHR on March 27, 2014, and familiarity with which is presumed, is scheduled to begin on July 10, 2017.  Now pending are five disputed motions *in limine*, to wit:

- Ward's First Motion, which seeks to exclude argument and evidence concerning the fact that he received a traffic citation for the accident at issue, as well as characterizations of the citation as a criminal offense (*see* Docket No. 3927);[1]

- Ward's Second Motion, which seeks to exclude evidence and argument that he failed to preserve, destroyed, or otherwise spoliated sensing and diagnostic module ("SDM") data from his car (*see* Docket No. 3933);

- Ward's Third Motion and New GM's Thirty-Third Motion,[2] which concern the admissibility of two demonstrative videos made by Ward and his son (*see* Docket Nos. 3924, 3937); and

---

[1]    Unless otherwise noted, all docket references are to the MDL docket, 14-MD-2543.

[2]    For reasons that are not entirely clear, plaintiffs in this MDL have adopted the practice of numbering their motions *in limine* separately for each trial, restarting each time with the number one.  By contrast, New GM continues in each trial from whatever number it finished at in the prior trial.  Thus, New GM's Thirty-Third Motion *in Limine* is its thirty-third motion *in limine* in the MDL overall, not its thirty-third motion with respect to Ward.

- Ward's Fourth Motion, which seeks to preclude evidence and argument regarding his history of smoking. (*See* Docket No. 3941).

In addition, Ward seeks an advanced ruling that he may introduce certain other similar incident ("OSI") evidence — namely, evidence concerning sixty other crashes allegedly attributable to the ignition switch defect in certain General Motors cars. (Docket No. 3761 ("Pl.'s OSI Br.")).

For the reasons stated below, Ward's First Motion and New GM's Thirty-Third Motion are GRANTED, Ward's Third and Fourth Motions are DENIED, and the Court reserves judgment on Ward's Second Motion pending trial. In addition, Ward's application to admit OSI evidence is GRANTED in part and DENIED in part.[3]

## A. Ward's First Motion *in Limine*

In his first motion *in limine*, Ward argues principally that Arizona law precludes New GM from introducing evidence (or argument) concerning the fact that he was cited for a civil traffic infraction in connection with the accident at issue and ultimately admitted responsibility for a civil traffic violation. (Docket No. 3928, at 5-6). New GM does not appear to dispute that evidence of the citation and Ward's admission of responsibility would be inadmissible under Arizona law, which provides that "an admission of the allegation of a civil traffic complaint or a judgment on the complaint is not evidence of negligence in a civil . . . proceeding." Ariz. Rev. Stat. Ann. § 28-1599; *see also, e.g.*, *Ingrum v. Tuscon Yellow Cab. Co.*, 642 P.2d 868, 872 (Ariz. Ct. App. 1981) ("The fact of citation or non-citation of a driver … is inadmissible in an action for negligence."). Instead, New GM contends that, under *Erie v. Tompkins*, 304 U.S. 64 (1938),

---

[3] Some of the issues decided here may be affected — or even mooted — by the Court's decisions on the parties' *Daubert* motions and dispositive motions (all of which are now fully briefed and under advisement). Needless to say, the Court's rulings are subject to modification — or even reconsideration — as appropriate in light of subsequent decisions.

the admissibility of Ward's citation and admission of responsibility is a function of federal law — namely, the Federal Rules of Evidence — rather than state law and that federal law allows such evidence "as party admissions and/or pursuant to the public records exception." (Docket No. 3980 ("Def.'s MIL 1 Opp'n"), at 4-5 (citing cases)).

The Court concludes that Ward has the better of the argument. Although there is general consensus that the Federal Rules of Evidence ordinarily govern in diversity cases, courts disagree about whether that is because *Erie* applies or because the Federal Rules of Evidence (at least in their original form) were enacted by Congress. *See, e.g.*, *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 877-81 (10th Cir. 2006) (holding that *Erie* does not apply, but that the original Federal Rules of Evidence govern in diversity cases because they were enacted by Congress); *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003) (applying *Erie*). In either case, though, the overwhelming weight of authority holds that "[w]here a state law excludes certain evidence in order to effect *substantive* policy considerations," such evidence should not be admitted by a federal court sitting in diversity. *Sims*, 469 F.3d at 881 (emphasis added) (reaching that conclusion on the ground that Rule 401 of the Federal Rules of Evidence itself "acts to exclude the evidence since the proposition for which the evidence is submitted is not properly provable and, therefore, irrelevant to the claim"); *see Feldman*, 322 F.3d at 666 (reaching the same conclusion because, "[p]ursuant to *Erie* and its progeny, federal courts sitting in diversity apply state substantive law and federal procedural law"); *Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 110 (4th Cir. 1995) (same); *Potts v. Benjamin*, 882 F.2d 1320, 1324 (8th Cir. 1989) (same). More specifically, if the language and policy of a state rule "point to achieving fair, accurate, and efficient resolutions of disputes, the rule is procedural" and does not apply in diversity cases; by contrast, "[i]f . . . the primary objective" of a state rule "is directed to influencing conduct

through legal incentives, the rule is substantive" and does. *Sims*, 469 F.3d at 883.

Applying those standards here, the Court concludes that the Arizona statute barring admission of a civil traffic complaint or a judgment on the complaint is substantive and thus applies. That is, the purpose of the statute is not "to achieve accuracy, efficiency, and fair play in litigation, without regard to the substantive interests of the parties." *Id.* at 882. Instead, the language and policy of the Arizona rule make plain that its "primary objective" is to "influenc[e] conduct through legal incentives," *id.* at 883 — namely, to encourage the quick resolution of traffic citations by allaying motorists' fears that if they pay a fine, that payment will be used against them in later proceedings. *See, e.g.*, 22A Fed. Prac. & Proc. Evid. § 5201 (2d ed.) ("[M]any states have adopted statutes making guilty pleas in motor vehicle prosecutions inadmissible in subsequent civil litigation. The legislators approved these statutes to encourage defendants to plead guilty rather than to turn the traffic court into a battleground or discovery site for ensuing civil litigation."). It follows that the rule applies in this case and precludes New GM from using evidence of Ward's citation and admission of responsibility to prove his negligence. *Cf. Feldman*, 322 F.3d at 666–67 (applying California law to exclude recorded conversations); *Gardner v. Chrysler Corp.*, 89 F.3d 729, 736 (10th Cir. 1996) (applying a Kansas statute prohibiting the admission of seat belt nonuse evidence); *Potts*, 882 F.2d at 1324 (applying an Arkansas statute excluding evidence concerning the failure to secure minors in child seats).

In arguing otherwise, New GM relies almost exclusively on the Third Circuit's decision in *Rain v. Pavkov*, 357 F.2d 506 (3d Cir. 1966), which held that a guilty plea to reckless driving was admissible in a diversity action despite a Pennsylvania law to the contrary. (New GM cites several other cases and a treatise as well, but all of those authorities rely, in turn, on *Rain*. (Def.'s MIL 1 Opp'n 4-5)). But *Rain* was decided before the Federal Rules of Evidence were

4

enacted and turned, instead, on application of Rule 43(a) of the Federal Rules of Civil Procedure. Under that Rule, evidence that met "any one of [three] prescribed tests [was] admissible in the federal courts. In the event of a conflict between state and federal law, the rule which favor[ed] admissibility . . . [was] followed." *Rain*, 357 F.2d at 510. Thus, *Rain*'s analysis and conclusion have only limited applicability and utility today, and the Court declines to follow the decision. Instead, applying the more modern federal law discussed above, the Court concludes that the Arizona statute barring evidence of a civil traffic complaint and a judgment on such a complaint applies to this case. It follows that Ward's first motion *in limine* must be and is granted.

**B. Ward's Second Motion *in Limine***

Next, Ward moves to exclude evidence and argument that he failed to preserve, destroyed, or otherwise spoliated SDM data from his car. (Docket No. 3934 ("Pl.'s MIL 2 Br.")). The SDM is a device that records certain data in connection with an event such as a crash. (Docket No. 3935 ("Def.'s MIL 2 Decl."), Ex. 2 ("Pitman Rpt."), at 7-8). Where, as in this case, a crash is a "non-deployment event" (that is, it is below the threshold where the airbags are designed to deploy), the data are "soft written" to the SDM — meaning that the data are not permanently stored, but can be overwritten by other events or the absence of subsequent events. (*Id.*). Soft-written data in a 2009 Chevrolet HHR's SDM are apparently overwritten after 250 ignition cycles. (*Id.*). In this case, Ward's car was taken after his March 2014 accident to a repair facility, where it was repaired. (Def.'s MIL 2 Decl., at Ex. 1 ("Ward Depo. Tr."), at 15, 104). Ward resumed driving his car in August or September 2014, and then drove it for over two years (during which time, it is safe to assume, the car exceeded 250 ignition cycles) until, in October 2016, the SDM was finally downloaded. (*Id.* at 113; Pitman Rpt. 6) At that point, the SDM did not contain any relevant event data. (Pitman Rpt. 6). Notably, assuming that data from

5

Ward's accident was captured by the SDM in the first place, there is no evidence establishing when the data was overwritten. (*Id.*; Pl.'s MIL 2 Br. 4 n.21).

Ward argues that, on these facts, New GM cannot proffer evidence to support a "finding of spoliation that would warrant the imposition of 'severe' sanctions, such as an adverse inference instruction or dismissal." (Pl.'s MIL 2 Br. 1). Significantly, New GM more or less concedes the point, clarifying that it "is not seeking spoliation sanctions" (at least "at this stage"). (Docket No. 3986 ("Def.'s MIL 2 Opp'n"), at 2). That is for good reason, because — among other things — there is no evidence that the SDM data would have been favorable to New GM. *See In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 9480315, at *3 (S.D.N.Y. Dec. 29, 2015) ("*Scheuer Spoiliation Op.*") (denying New GM's motion for spoliation sanctions on similar grounds). Nevertheless, New GM "seeks to introduce the facts related to plaintiff's destruction of the SDM data" on the ground that it is "otherwise relevant." (Def.'s MIL 2 Opp'n 2). Specifically, it contends that the evidence is relevant in three ways: (1) to the cross-examination of Ward's expert "as it undermines the reliability of both his reconstruction assumptions and his opinions on the severity of the crash"; (2) to prevent confusion or prejudice arising from the admission of OSI evidence involving accidents where SDM data was recovered; and (3) to impeach Ward, because "it directly contradicts his long-held claim that his airbags should have deployed" and because his "decision to continue driving the car enough times to override the SDM data demonstrates that plaintiff did not believe his car was defective or caused his crash." (*Id.*). Additionally, New GM argues that, even if an adverse inference *sanction* is not justified, a *permissive* adverse inference instruction — "that the jury may (but need not) draw adverse inferences based on the destruction of the SDM data" — is "appropriate." (*Id.* at 2-3).

6

Significantly, however, there is no evidence in the current record suggesting that Ward knew about the SDM, let alone that the SDM could have provided data relating to his accident or that such data could be destroyed through continued use of the car. In the absence of such evidence (not to mention, the absence of evidence suggesting that relevant data existed in the first place and would have been favorable to New GM), the mere fact that Ward failed to preserve the SDM data has little or no relevance and probative value. *See* Fed. R. Evid. 401-402. And in the absence of such evidence, permitting New GM to suggest through questions or to explicitly argue that the jury should draw an adverse inference based on the destruction of the SDM data would plainly risk unfair prejudice to Ward. *See* Fed. R. Evid. 403. New GM's arguments to the contrary are unpersuasive because they confuse the mere *absence* of the data with the possible *reasons* for that absence. That is, to cross-examine Ward's expert and distinguish Ward's accident from any other incidents for which SDM was available, it does not matter why the SDM data is now unavailable; all that matters is that the data *is* unavailable. Similarly, New GM is plainly entitled to cross-examine Ward about the fact that he continued to drive his car despite the accident and to argue from that fact that he did not believe the car was defective or dangerous. To make that argument, however, New GM need not introduce evidence or suggest that, by continuing to use the car, Ward spoliated the SDM data.

Thus, on the *current* record, the Court agrees with Ward that New GM should be precluded from introducing evidence or arguing that he failed to preserve, destroyed, or otherwise spoliated SDM data from his car and that the jury should be told — "in a neutral manner (ideally by stipulation) that does not suggest that either party was responsible," *Scheuer Spoliation Op.*, 2015 WL 9480315, at *5 n.6 — only that the SDM data is unavailable. That does not resolve the matter, however. Ward contends that New GM should be held to the current

record, as it had an opportunity to ask him questions about the SDM during his deposition and did not do so. (Docket No. 4022, at 1, 3). But he cites no authority for the proposition that a party is limited to asking questions at trial on subjects that it inquired about at a pretrial deposition; nor does he affirmatively proffer, let alone establish, that he did *not* know about the SDM data and the potential for its loss through continued use of his car. Accordingly, the Court reserves judgment until trial on whether to grant Ward's second motion *in limine* in all respects (and, relatedly, on whether to grant New GM's request for a permissive adverse inference instruction). At trial, the Court will give New GM a limited opportunity to establish, in a manner that avoids any risk of prejudice, that Ward understood the significance of the SDM data and the potential for its loss. The parties should confer with respect to how New GM should be permitted to do so — by questioning Ward outside the presence of the jury; asking neutral, non-leading questions in the presence of the jury; or some other means — and be prepared to discuss the matter at the final pretrial conference.

**C. Ward's Third Motion *in Limine* and New GM's Thirty-Third Motion *in Limine***

Ward's Third Motion and New GM's Thirty-Third Motion concern the same issue: the admissibility of two videos made by Ward and his son around the time Ward retained counsel.[4] The first video depicts Ward using his key, on his keychain, to start his 2009 HHR and then, several times, intentionally applying an unspecified amount of force (in an action the Court would describe as "flicking") to rotate the key out of the "run" position and cause the car to lose

---

[4] Needless to say, the result of two motions addressing the same issue is six memoranda of law covering largely the same ground rather than the usual three. In future bellwether cases, the parties should meet and confer before filing motions *in limine* to minimize, if not eliminate, such duplicative briefing. The parties should confer and submit a proposed order to that effect if they believe that one is necessary.

8

power. (Docket No. 3939 ("Pl.'s MIL 3 Decl."), at Ex. 2). The second video involves a similar "demonstration" by Ward's son in his Chevrolet Silverado, only the flicking never results in the key rotating out of the "run" position. (Docket No. 3938 ("Pl.'s MIL 3 Br."), at 3; Pl.'s MIL 3 Decl., Ex. 3). Ward expressly notes that he does not seek to offer the videos as substantive evidence (Docket No. 3989 ("Pl.'s MIL 33 Opp'n"), at 8), and for good reason: As out-of-court statements offered to prove the truth of a matter asserted, the videos would plainly constitute hearsay. *See, e.g.*, *United States v. Martinez*, 588 F.3d 301, 311 (6th Cir. 2009). Instead, Ward seeks to use the videos as demonstrative exhibits "for the purpose of illuminating" his testimony. (Pl's MIL 33 Opp'n 8). Specifically, he contends that the videos "demonstrate the propensity of Mr. Ward's ignition switch to rotate in non-severe conditions, as well as the physical characteristics of Mr. Ward's key chain and Mr. Ward's seating position in his car. Mr. Ward will testify to each of these facts as a live witness at trial; the demonstrative videos will simply help to clarify this testimony for the jury." (*Id.* at 8-9).

These arguments are disingenuous at best. Ward does not need the videos to depict the physical characteristics of his keychain and seating position in the car; as New GM notes, he may, without objection, use still frames from the first video to do both. (Docket No. 3990 ("Def.'s MIL 3 Opp'n"), at 8). And using the videos to "demonstrate" the propensity of Ward's switch to rotate (Pl.'s MIL 33 Opp'n 8), to "refute" New GM's contentions about the probability of inertial rotation (Docket No. 4024, at 2 n.1), or to "prov[e] that the ignition switch will, in fact, rotate . . . in less-than-extreme conditions" (*id.* at 4) is to use them to prove the truth of a matter asserted in violation of the rules against hearsay; labeling the videos "demonstrative" rather than "substantive" exhibits does not render that use any more permissible. And in any event, the videos suffer from a host of other problems. First, the video of the Silverado is totally

9

irrelevant; how the ignition switch in Ward's car compared to the ignition switch in his son's vehicle is not relevant to any issue in dispute. Second, the video of Ward's car is only marginally probative, as it depicts him *intentionally* applying force to his keychain while Ward alleges that his accident was caused by *inadvertent* rotation of the ignition switch in his car. Third, allowing the jury to see the video risks confusion and unfair prejudice, as the amount of force Ward applied to his keychain is unknown. And finally, the question of whether Ward's switch had sufficient torque resistance (the subject of the videos and any testimony about them) is the province of expert, not lay, testimony. Ward is concededly not an expert, and the "tests" depicted in the videos were plainly not done in accordance with scientific standards.

Notably, the videos do not come close to meeting the standard for admission cited in Ward's own briefs. Quoting from *Bellinger v. Deere & Co.*, 881 F. Supp. 813, 816 (N.D.N.Y. 1995), Ward insists that "[d]emonstration evidence is admissible at the discretion of the court where the conditions of the demonstration are similar to those at the time in question and where it is proffered merely to show the mechanical principles involved in the operation of the equipment in question." (Pl.'s MIL 3 Br. 5). As Ward himself concedes, however, the conditions in the video are plainly dissimilar to those at the time of the accident as the car was not even moving (*see* Pl.'s MIL 33 Opp'n 13), and Ward does not proffer the videos to show the mechanical principles involved in the operation of the ignition switch. In fact, he admitted in his deposition that he made the videos to demonstrate that his switch was "messed up" and thus defective. (Pl.'s MIL 3 Decl., Ex. 1, at 262). Nor are the other cases upon which Ward relies any more helpful, as they did not involve anything of the sort proposed here — namely, presentation through a lay witness of self-serving videos depicting unscientific demonstrations made for the purpose of litigation in order to prove precisely what the plaintiff needs to prove in

that litigation. *See, e.g.*, *Clevenger v. CNH Am., LLC*, 340 F. App'x 821, 825 (3d Cir. 2009) (affirming a decision to admit a demonstrative video depicting the defendant's *expert* operating the machinery at issue); *Edwards v. ATRO SpA*, 891 F. Supp. 1085, 1086-88 (E.D.N.C. 1995) (allowing a videotaped demonstration by the plaintiff's *expert* in part to familiarize the jury with "a piece of commercial equipment many have never seen," noting that the case did "not involve a product such as an automobile, with which a jury would be uniformly familiar"); *Veliz v. Crown Lift Trucks*, 714 F. Supp. 49, 51-54 (E.D.N.Y. 1989) (approving the use of a demonstrative video by the defendant's *expert* to demonstrate "the physical and mechanical principles involved in the braking of lift trucks" and a "brief, live demonstration . . . to familiarize the jury with the operations of lift trucks in general").

In short, the Court concludes that the videos (and, relatedly, any testimony about the "tests" that they depict) should not be admitted at trial. Accordingly, New GM's Thirty-Third Motion *in Limine* is granted, and Ward's Third Motion *in Limine* is denied.

**D. Ward's Fourth Motion *in Limine***

Ward's fourth and final motion *in limine* seeks to preclude evidence and argument regarding his history of smoking. (*See* Docket No. 3941). In his opening memorandum of law, Ward contends that such evidence is irrelevant and prejudicial and should be precluded pursuant to Rules 401, 402, and 403. (*See* Docket No. 3942, at 3-6). Those arguments, however, are patently meritless, substantially for the reasons provided by New GM in its opposition memorandum of law. (*See* Docket No. 3983, at 2-6). Specifically, evidence of Ward's smoking is plainly relevant to his life expectancy and his claim for future damages, not to mention relevant to and probative of the cause of his alleged current and future symptoms (and, relatedly, of the reliability and credibility of Ward's expert's opinion that "all" of his disabilities are

11

"causally related to the accident"). (*See id.* at 2-6). Additionally, like the plaintiff in *Cockram*, Ward "provides no reasons why evidence of [his] tobacco use generally would be . . . so prejudicial as to substantially outweigh any probative value," particularly since the alleged prejudice is a product of what makes the evidence so probative: that smoking is unhealthy. *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2016 WL 4410008, at *5 (S.D.N.Y. Aug. 18, 2016) (citing Fed. R. Evid. 403). Perhaps revealingly, in his reply memorandum of law, Ward switches gears somewhat, asserting that New GM lacks admissible evidence with respect to the effects of smoking on health and life expectancy. (*See* Docket No. 4021, at 1 n.1, 4). But that argument is both procedurally improper — a party may not raise new arguments in a reply, *see, e.g.*, Docket No. 1770, at 2 — and "premature. If and when New GM seeks to introduce evidence of [Ward's] tobacco use at trial, [Ward] may make appropriate objections." *Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 4410008, at *5. Thus, Ward's Fourth Motion *in Limine* is denied without prejudice to objection to specific evidence at trial.

**E. The Admissibility of OSI Evidence**

Finally, Ward seeks to admit evidence of fifty-eight other incidents to prove New GM's knowledge and notice of the alleged defect and eight other incidents to prove the existence or magnitude of the defect as well as causation. (Pl.'s OSI Br. 1). The applicable legal standards, discussed by the Court in connection with three earlier bellwether trials in this MDL, are undisputed. *See In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4410030 (S.D.N.Y. Aug. 18, 2016) ("*Cockram*"); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 796846, at *2 (S.D.N.Y. Feb. 25, 2016) ("*Barthelemy/Spain*"); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 9463183, at *1 (S.D.N.Y. Dec. 28, 2015) ("*Scheuer*"). Those standards provide that,

in a product liability case such as this, OSI evidence may be admitted to prove "negligence, a design defect, notice of a defect, or causation." *Hershberger v. Ethicon Endo-Surgery, Inc.*, No. 10-CV-0837, 2012 WL 1113955, at *2 (S.D. W. Va. Mar. 30, 2012); *see also McClure v. Walgreen Co.*, 613 N.W.2d 225, 234 (Iowa 2000) (holding that OSI evidence "was obviously relevant to the punitive-damage issue of willful and wanton conduct"). But before such evidence "may be admitted for any purpose, the proponent must establish [the prior accidents'] relevance by showing that they occurred under the same or substantially similar circumstances as the accident at issue." *Schmelzer v. Hilton Hotels Corp.*, No. 05-CV-10307 (JFK), 2007 WL 2826628, at *2 (S.D.N.Y. Sept. 24, 2007); *see also Barker v. Deere & Co.*, 60 F.3d 158, 162 (3d Cir. 1995) (noting that every Court of Appeals that has considered the admissibility of prior accidents in products liability cases has applied the substantial similarity standard). "Whether a prior accident occurred under 'substantially similar' conditions necessarily 'depends upon the underlying theory of the case, and is defined by the particular defect at issue.'" *Lidle v. Cirrus Design Corp.*, 505 F. App'x 72, 74 (2d Cir. 2012) (summary order) (quoting *Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363, 367 (W.D.N.Y. 1999)).

Significantly, the requisite degree of similarity varies according to the purpose for which OSI evidence is offered. For example, "[e]vidence proffered to illustrate the existence of a dangerous condition necessitates a high degree of similarity because it weighs directly on the ultimate issue to be decided by the jury." *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1440 (10th Cir. 1992). Similarly, where OSI is offered to prove causation, courts tend to consider multiple factors — namely, whether "(1) the products are similar; (2) the alleged defect is similar; (3) causation related to the defect in the other incidents; and (4) exclusion of all reasonable secondary explanations for the cause of the other incidents." *Watson v. Ford Motor*

13

*Co.*, 389 S.C. 434, 453 (2010); *see also* 1 McCormick on Evid. § 200 (7th ed. 2013) (noting that courts are more likely to allow OSI evidence to show causation "when the defendant contends that the alleged conduct could not possibly have caused the plaintiff's injury"). By contrast, the substantial similarity standard is "relaxed" where OSI evidence is offered to show notice; that is, "the similarity in the circumstances of the accidents can be considerably less than that which is demanded when the same evidence is used for one of the other valid purposes." *Schmelzer*, 2007 WL 2826628, at *2. As the substantial similarity inquiry is "fact-specific," a "district court is owed considerable deference in its determination of substantial similarity." *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1126 (10th Cir.), *as clarified on reh'g*, 400 F.3d 1227 (10th Cir. 2004). If substantial similarity is established, "[a]ny differences in the accidents . . . go to the weight of the evidence" rather than its admissibility. *Four Corners*, 979 F.2d at 1440.

In the present case, the parties dispute how these principles apply to several categories of alleged OSI evidence.[5] The Court will address each category in turn.

***National Highway Traffic Safety Administration ("NHTSA") Customer Complaints.***
First, Ward seeks to admit — to prove notice, the existence of defect, and causation — three unverified complaints to NHTSA. (Pl.'s OSI Br. 22-26; *see* Pl.'s OSI Discl., Rows 58-60). Such reports, however, are hearsay, and thus inadmissible as a matter of course. *See, e.g.*, *Landis v. Jarden Corp.*, 5 F. Supp. 3d 808, 815 (N.D.W. Va. 2014); *Hendricks v. Ford Motor Co.*, No. 12-CV-71, 2012 WL 4478308, at *2 (E.D. Tex. Sept. 27, 2012); *Guild v. Gen. Motors Corp.*, 53 F.

---

[5] Ward includes in his application a prior incident in his own vehicle. (Pl.'s OSI Br. 16; *see* Pl.'s OSI Br., Ex. 1 ("Pl.'s OSI Discl."), Row 57). The Court need not decide whether that incident is subject to analysis under the OSI principles set forth above, as New GM does "not dispute that [P]laintiff can offer factual testimony about this incident at trial." (Docket No. 3831 ("Def.'s Opp'n Br."), at 15).

14

Supp. 2d 363, 368 (W.D.N.Y. 1999). Additionally (and relatedly), as the Court observed during the *Scheuer* trial, such complaints are not the kind of materials upon which an expert would reasonably rely. (*Scheuer* Trial Tr. at 718). Ward argues otherwise by alleging that these reports were "relied upon by New GM's outside consultant," the Virginia Tech Transportation Institute ("VTTI"), which "characterized the incidents as involving inadvertent ignition switch rotations due to knee-key contact." (Pl.'s OSI Br. 16). But that argument does not overcome the hearsay problem. Moreover, as New GM points out, VTTI identified the three complaints when it performed a "database search" for "knee-key related incidents," but the Institute never actually verified or analyzed the incidents following the search. (Def.'s Opp'n Br. 20). Additionally, and as VTTI itself observed, there are reasons to doubt the reliability of the complaints: All three were filed after the initial recall, and two of the three were made more than a year after the incidents to which they related. (*Id.* at 21). Finally, and in any event, the three complaints lack sufficient information about the relevant incidents for the Court to conduct the requisite substantial similarity analysis, even under the more relaxed standard applicable to notice. Accordingly, Ward may not offer evidence pertaining to these three incidents for any purpose.

*Existence of a Defect and Causation.* Next, Ward seeks to admit evidence of four incidents (Melton, Caban, Gamage, and Paluszek) to prove the existence of a defect and causation. (Pl.'s OSI Br. 22-26; *see* Pl.'s OSI Discl., Rows 20, 36, 44, 48). Applying the heightened standard of substantial similarity that applies to evidence offered to prove the existence of a defect and causation, the Court agrees with New GM that the incidents — none of which involved the ignition switch actually at issue in this case — are inadmissible for those purposes. First, the Melton and Caban incidents are easy calls. The former involved not only a different ignition switch, but a different kind of vehicle (a 2005 Chevrolet Cobalt) altogether.

(*See* Def.'s Opp'n Br. 16-17). Additionally, the circumstances of the accidents (for example, in Ward's case, the road was dry, while Melton involved wet conditions) and the stature of the drivers (Ward is a 6 foot, 218 pound male while Melton was a 29-year-old female) differed significantly. (*See id.*). Against these points of dissimilarity, Ward asserts that both incidents involved "rough road conditions" and "a key that had a slotted keyhead design and several keychain attachments" (Def.'s Opp'n Br. 24-25), but those similarities are not enough to satisfy the heightened standard applicable to proving causation and the existence of a defect.

Caban did involve the same vehicle as the present case, but an earlier — and different — version of the ignition switch, the very feature of the vehicle alleged to be defective here. (*Id.* at 17). Moreover, Ward provides no factual support for his assertion that the two incidents were "substantially similar" (Pl.'s OSI Br. 24-25) — a shortfall that is all the more notable given that the Court excluded evidence relating to the Caban incident in the *Barthelemy/Spain* trial on similar grounds. *See Barthelemy/Spain*, 2016 WL 796846, at *4; *see also, e.g.*, *Ruminer v. General Motors Corp.*, 03-CV-0349 (GTE), 2006 WL 287945, at *14 (E.D. Ark. Feb. 6, 2006) (finding that Plaintiff had failed to meet his burden when he made "no effort to demonstrate or explain how" the OSIs were substantially similar to the alleged product defects in his case); *Great N. Ins. Co. v BMW of N. Am., LLC*, 02-CV-1153, 2015 WL 3936229, at *10 (S.D. Ohio June 26, 2015) (excluding OSI evidence for purposes of proving causation because the plaintiffs had failed to establish that "they [would] lay the proper foundation to prove the prior incidents were sufficiently similar").

By contrast, the Gamage and Pluszek incidents both involved the same vehicle as the incident in this case, and Ward does provide some information concerning the two. But the differences between the incidents and Ward's preclude use of the earlier incidents to prove the

existence of a defect or causation.  Most significantly, the vehicles in the Gamage and Pluszek incidents featured an earlier — and different — ignition switch from the vehicle at issue here. (Pl.'s OSI Br. 2-5; Def,'s Opp'n Br. 2-4).  Whether Ward's switch can be said to suffer from the same defect as the earlier switch and, if so, whether his accident was caused by that defect are perhaps the central issues in this case.  (Pl.'s OSI Br. 3-7, 10-12; Def.'s Opp'n Br. 10-15).  Ward, however, provides no theory by which two crashes involving the earlier — admittedly defective — switch under somewhat different circumstances could possibly shed light on those questions. As it was in the *Barthelemy/Spain* case, "the contrast to *Scheuer* is telling.  There, the plaintiff's theory was that the airbags in his car should have deployed when he crashed and that the only explanation for the fact that they did not deploy was inadvertent switch rotation.  The fact that there were other crashes (under relatively similar circumstances, no less) in which the only explanation found for airbag non-deployment was the ignition switch defect plainly tended to support that theory (and tended to support the plaintiff's experts' opinions to that effect)." 2016 WL 796846, at *6.  Here, by contrast, there is nothing about the Gamage and Pluszek evidence that tends to make Ward's theories of defect and causation "more or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Accordingly, the evidence is not admissible to prove the existence of a defect or causation.

*Notice.*  Finally, Ward seeks to admit evidence (largely in the form of documents generated by New GM) relating to fifty-six other incidents — fifty-two of which were admitted in *Cockram* — solely for purposes of proving notice.  (Pl.'s OSI Br. 19-20; *see* Pl.'s OSI Discl., Rows 1-56).  Again, New GM opposes the request on the ground that the vehicles in most, if not all, of those incidents were different from the ignition switch in Ward's vehicle.  (Def.'s Opp'n Br. 10-15).  But that argument lacks the same force under the "relaxed" standard that applies

17

when OSI evidence is offered to prove notice. *Scheuer*, 2015 WL 9463183, at *2. That is, Ward alleges in his Amended Complaint that his ignition switch suffered from the same type of defect as the earlier admittedly defective ignition switch: insufficient torque that enabled the switch to inadvertently move from the "run" position to the "off" or "accessory" position, thereby disabling critical safety systems in the vehicle. (14-CV-8317, Docket No. 157, ¶¶ 19, 28). Moreover, there is evidentiary support for that allegation: Among other things, New GM itself concluded that the torque in the new switch was below specification, warned drivers of vehicles with the new switches that large keychains and jarring road conditions could result in inadvertent rotation, and ultimately extended the initial recall to include vehicles with the new switch (albeit allegedly because such vehicles might have been serviced or repaired with one of the earlier, admittedly defective switches). (Pl.'s OSI Br. 1-5). In the final analysis, New GM's arguments about the differences between the two switches go to weight rather than admissibility. *See, e.g.*, *Scheuer*, 2015 WL 9463183, at *2; *Jodoin v. Toyota Motor Corp.*, 284 F.3d 272, 280 (1st Cir. 2002) ("When the relevant elements are sufficiently similar, we further emphasize that other differences are for defendants to highlight and the jury to weigh in its deliberations."). In fact, to exclude the other incidents would arguably "prevent the jury from understanding the scale, significance, and duration of Old GM's and New GM's conduct with respect to the ignition switch defect" allegedly at issue in this case. *Cockram*, 2016 WL 4410030, at *4.

***Remaining Issues.*** Two collateral issues remain. First, New GM contends that the Court should limit, if not preclude, Ward's introduction of OSI evidence involving airbag non-deployment because his expert "concedes that airbag deployment was not warranted in this accident." (Def.'s Opp'n Br. 22). As in *Barthelemy/Spain*, the Court "will not permit Plaintiff to introduce excessive evidence of airbag non-deployment given [his] concession that [his] crash

18

did not exceed to deployment threshold." 2016 WL 796846, at *5 n.2. But the Court will not go further than that and preclude such evidence altogether. Second, New GM objects to testimony by Ward's expert, Steve Loudon, about the OSIs on the ground that he conceded that he could not say whether they were "actually similar" to Ward's accident and that he did not know whether inadvertent rotation caused or contributed to causing fifty-six of the OSIs. (Def.'s Opp'n Br. 23). Any such objection, however, should have been raised by way of a *Daubert* motion, not by way of New GM's opposition to Ward's offer of OSI proof.

## CONCLUSION

For the reasons stated above, Ward's First Motion *in Limine* and New GM's Thirty-Third Motion *in Limine* are granted, Ward's Third and Fourth Motions *in Limine* are denied, and the Court reserves judgment on Ward's Second Motion *in Limine* pending trial. In addition, Ward's application to admit OSI evidence is granted in part and denied in part. Specifically, Ward may introduce evidence of fifty-six of the sixty OSIs (Pl.'s OSI Discl., Rows 1-56) for purposes of proving notice only. Ward may not introduce evidence of any OSIs (except the one in his own vehicle (*id.* at Row 57), which may or may not constitute OSI evidence in the first instance) to prove the existence of a defect or causation. Finally, the three unverified consumer complaints (*id.*, Rows 58-60) will not be admitted for any purpose.

The Clerk of Court is directed to terminate 14-MD-2543, Docket Nos. 3761, 3924, 3927, 3933, 3937, and 3941 and 14-CV-8317, Docket Nos. 220, 223, 229, 233, and 237.

SO ORDERED.

Dated: June 9, 2017
      New York, New York

JESSE M. FURMAN
United States District Judge