USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/20/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

14-MD-2543 (JMF)

*This Document Relates To:*
*Ward v. General Motors LLC, 14-CV-8317*

OPINION AND ORDER

------------------------------------------------------------------------------x

JESSE M. FURMAN, United States District Judge:

**[Regarding the Parties' *Daubert* Motions and Cross-Motions for Summary Judgment]**

The next bellwether trial in this multidistrict litigation ("MDL"), familiarity with which is presumed, involves claims brought under Arizona law by Plaintiff Dennis Ward against General Motors LLC ("New GM") stemming from a March 27, 2014 accident involving Ward's 2009 Chevrolet HHR. That car was manufactured by General Motors Corporation ("Old GM") — which filed for bankruptcy in 2009, a bankruptcy from which New GM emerged after it purchased most of Old GM's assets and assumed some of its liabilities. Now pending are (1) dueling motions to preclude expert opinions and testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence (Docket Nos. 3873, 3877); and (2) cross-motions, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment. (Docket Nos. 3868, 3882).[1]

For the reasons stated below, New GM's *Daubert* motion is granted in part and denied in part, while Ward's *Daubert* motion is denied without prejudice to raising objections to particular testimony at trial. Additionally, New GM's motion for summary judgment is denied to the extent that it seeks dismissal of all claims on causation grounds and Ward's claims sounding in

---

[1] Unless otherwise noted, all docket references are to the MDL docket, 14-MD-2543.

negligence on other grounds, but granted to the extent that it seeks dismissal of Ward's fraud claims. Finally, Ward's motion for partial summary judgment is denied.

## BACKGROUND

Ward, a resident of Arizona, purchased a used 2009 Chevrolet HHR from Precision Toyota, a car dealership in Tucson, Arizona, in December 2012. (Docket No. 3870 ("New GM SOF") ¶¶ 6, 7; 14-CV-8317, Docket No. 157 ("Am. Compl.") ¶¶ 18, 39). The car was previously owned by John and Sue Suor, who had purchased it from an authorized Old GM dealership in 2008. (New GM SOF ¶ 5). A little over two years after Ward's purchase, on the morning of March 27, 2014, he was driving the car on or near a rough patch of roadway in Tucson when he crashed into a Ford Explorer directly in front of him. (*Id.* ¶¶ 13, 14, 19; Docket No. 4052 ("New GM Response SOF") ¶ 49). Ward claims that, prior to impact, he saw that the driver of the Ford Explorer had stopped, so he "smashed" on his brake pedal and "attempt[ed] to steer away," but he was unable to prevent the crash because his "vehicle suddenly and unexpectedly lost power." (New GM SOF ¶ 18; Am. Compl. ¶¶ 1, 19-21). He alleges that was due to a defect in the ignition switch of his car that allowed the switch to move from the "run" to the "accessory" or "off" positions when the vehicle "experience[d] rough road conditions or other jarring." (Am. Compl. ¶¶ 28, 72). Whatever the cause of the accident, Ward sustained severe injuries, including a ruptured patellar tendon, and was subsequently hospitalized. (*Id.* ¶¶ 22-25).

On the following day, March 28, 2014, New GM expanded a previously announced recall relating to ignition switch defects in certain of its vehicles — familiarity with which is presumed — to include certain 2008-2011 model year vehicles, including Ward's HHR. (New GM SOF ¶ 4). While the previous recall concerned only ignition switches containing service part number

10392423 (the "423 switch"), the new recall was directed at vehicles that might have received the concededly defective 423 switch during repairs. (*Id.* ¶¶ 1-4). Significantly, Ward's ignition switch, at the time of his accident, was not the concededly defective 423 switch; it was a switch containing service part number 15886190 (the "190 switch"), which contained a longer spring and detent plunger assembly that New GM began using in or about 2008. (*Id.* ¶ 8; New GM Response SOF ¶ 44). In April 2014, New GM sent Ward a recall notice regarding the ignition switch defect. (Docket No. 4003 ("Ward Add'l SOF") ¶ 61). In the notice, New GM notified Ward that it would replace his ignition switch "[w]hether or not [his] ignition switch ha[d] been previously serviced." (New GM Response SOF ¶ 64). In detailing the dangers of the 423 switch, the recall notice warned that "[t]here is a risk, under certain conditions, that your ignition switch may move out of the 'run' position, resulting in a partial loss of electrical power and turning off the engine. This risk increases if your key ring is carrying added weight (such as more keys or the key fob) or your vehicle experiences rough road conditions or other jarring or impact related events. If the ignition switch is not in the run position, the airbags may not deploy i[f] the vehicle is involved in a crash, increasing the risk of injury or fatality." (Ward Add'l SOF ¶ 63).

On October 17, 2014, Ward filed this action against New GM, alleging that he suffered various injuries as a result of the accident, which was caused, in turn, by his car unexpectedly losing power due to a defect in the car's ignition switch. (14-CV-8317, Docket No. 1). Specifically, Ward brings claims under Arizona law pursuant to four theories: negligence (Count I), strict liability (Count II), fraudulent concealment (Count III), and violation of the Arizona Consumer Fraud Act (Count IV). (Am. Compl. ¶¶ 118-158). All but the strict liability claim are pleaded (in the terminology of the bankruptcy court that presided over the bankruptcy of Old

GM) as "Independent Claims" — that is, claims "based solely on New GM's own, independent, post-Closing acts or conduct." *In re Motors Liquidation Co.*, 09-50026 (REG), Docket No. 13177 ¶ 4 (Bankr. S.D.N.Y. June 1, 2015); *see, e.g.*, *In re: Gen. Motors LLC Ignition Switch Litig.*, 202 F. Supp. 3d 362, 364-72 (S.D.N.Y. 2016) ("*Cockram Summ. J. Op.*") (discussing the definition of "Independent Claims"). Ward seeks both compensatory damages and punitive damages with respect to these Independent Claims. (Am. Compl. ¶¶ 159-163). In light of rulings by the bankruptcy court, Ward seeks only compensatory damages with respect to his strict liability claim, as to which New GM assumed liability from Old GM in connection with the bankruptcy. *See, e.g.*, *In re Motors Liquidation Co.*, 541 B.R. 104, 108 (Bankr. S.D.N.Y. 2015) (concluding that claims for punitive damages can only be "based on New GM knowledge and conduct alone" because New GM did not assume liability for punitive damages under the Sale Agreement with Old GM).

## THE *DAUBERT* MOTIONS

The Court begins with the parties' competing *Daubert* motions. (Docket Nos. 3873 and 3877). The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides in relevant part that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert*, the United States Supreme Court defined the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence —

especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. "The Rule 702 inquiry is a flexible one that "depends upon the particular circumstances of the particular case at issue." *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 9480448, at *2 (S.D.N.Y. Dec. 29, 2015) ("*Scheuer Daubert Op.*") (internal quotation marks omitted). "Although a district court should admit expert testimony only where it is offered by a qualified expert and is relevant and reliable, exclusion remains the exception rather than the rule." *Id.* (internal quotation marks omitted). And "[a]lthough expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* (internal quotation marks omitted). As the *Daubert* Court itself stressed, "the traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

## A. New GM's *Daubert* Motion

New GM challenges the testimony of four experts that Ward intends to call: Matthew Pitman, Glen Stevick, Steve Loudon, and David Lent. The Court addresses each expert in turn, followed by a brief discussion of one issue relating to both Loudon and Stevick.

### 1. Matthew Pitman

First, New GM seeks to preclude testimony from Ward's accident reconstructionist, Matthew Pitman. To the extent that New GM seeks to preclude Pitman from offering his opinion that the accident was caused by inadvertent key rotation, the motion falls short. Pitman

is indisputably qualified as an accident reconstructionst, and his reconstruction of the accident and opinion that it was caused by inadvertent key rotation are based on commonly used methods, including tests he conducted, and a review of medical records, witness depositions, repair records, and photographs. (Docket No. 3875 ("New GM Decl.") Ex. 1 ("Pitman Rpt."), at 1-2, 5-6). New GM's arguments to the contrary — including, for example, its argument that Pitman ignored certain facts in concluding that Ward's anti-lock braking system was inoperable at the time of the accident (*see* Docket No. 3874 ("New GM Daubert Mem."), at 11-13) — ultimately go to the weight, not the admissibility, of Pitman's testimony and are fodder for cross-examination, not exclusion. *See, e.g.*, *Scheuer Daubert Op.*, 2015 WL 9480448, at *3. By contrast, New GM's arguments are well founded to the extent that Ward proposes to elicit Pitman's opinion on why or how the key inadvertently rotated. (New GM Daubert Mem. 10-11; Docket No. 4048 ("New GM Daubert Reply"), at 4-5; New GM Decl. Ex. 2, at 157, 174; Pitman Rpt. 9). (Whether Ward does intend to go that far is somewhat unclear.) Pitman lacks the qualifications to testify on that subject, and did not collect or analyze the sorts of date that he would need to do so. (*See* New GM Daubert Mem. 10-11 & nn. 47-55). Accordingly, New GM's motion as to Pitman's testimony is granted in part and denied in part.

### 2. Glen Stevick

Next, New GM seeks to preclude Glen Stevick, a mechanical engineer who specializes in failure analysis and the design of mechanical-electrical equipment and systems (New GM Decl. Ex 10 ("Stevick Rpt."), at 3-4, Apx. A), from testifying that Ward's ignition switch rotated due to "knee-key interaction." (New GM Daubert Mem. 13-14). Significantly, however, the Court allowed Stevick to offer nearly identical testimony in the first bellwether trial. *See Scheuer Daubert Op.*, 2015 WL 9480448, at *3. New GM makes a valiant effort to argue that this case is

different, because the data upon which Stevick relies primarily concerns the 423 ignition switch — the concededly defective earlier version of the switch — rather than the 190 switch that was in Ward's car. (New GM Daubert Mem. 13-14; New GM Daubert Reply 8-9). But whether and to what extent the 190 switch suffers from the same defect as the 423 switch "is perhaps the core factual dispute in this case, and there is evidence," some of which is discussed below in connection with Ward's motion for partial summary judgment, "from which a jury could take Stevick's — and thus Plaintiff's — side in that dispute." *Scheuer Daubert Op.*, 2015 WL 9480448, at *3. Beyond that, the argument for admitting Stevick's testimony in this case is arguably stronger than it was in *Scheuer*. Whereas Stevick's testimony in *Scheuer* was based "primarily on observations of the car model at issue and New GM's testing and documentation," and not on "his own independent tests to evaluate the possibility of a knee-to-key event," *id.,* his testimony here *is* based in part on case-specific analysis and testing — namely, his examination of Ward's keychain and his use of "an exemplar vehicle to determine whether inadvertent knee-key rotation was possible using Plaintiff's keychain with the driver's knee positioned like Plaintiff's." (Docket No. 4011 ("Ward Daubert Opp'n"), at 25; *see also* Stevick Rpt. 18-24; Ward Daubert Opp'n 22-26). There may well be evidence to impeach Stevick's opinions, but that evidence ultimately "goes . . . to [his testimony's] weight, not its admissibility." *Scheuer Daubert Op.*, 2015 WL 9480448, at *3.[2]

### 3. Steve Loudon

Third, New GM seeks to preclude Ward's expert Steve Loudon from testifying about New GM's corporate culture and its actions with respect to the alleged defect — "including

---

[2]     New GM may have a legitimate objection if Stevick plans to testify that Ward's accident was "obviously" caused by knee-key interaction, as the data may not support such a definitive conclusion. (New GM Decl. Ex. 3, at 151:4-7). But it is not clear whether Stevick plans to go

opinions regarding the approval of the ignition switches in the first instance, as well as

subsequent efforts to investigate the Delta ignition switch issue over many years." (New GM

Daubert Mem. 14). New GM's argument is based almost exclusively on Loudon's answers to a

handful of questions in his deposition, in which he admitted that he is not (and has never been) a

"safety culture expert" and that Sections 6B, 6C, 6D, and 6E of his expert report contain

"opinions on safety culture." (*Id.* at 14-16 (citing New GM Decl. Ex. 6 ("Loudon Depo Tr."), at

141-42)). But Loudon is primarily, if not exclusively, offered as "an engineering expert who was

formerly employed by GM regarding GM's failure to act in accordance with sound engineering

principles." (Ward Daubert Opp'n 27-30; *see also* New GM Decl. Ex 7, at 3-5). And the vast

majority of Loudon's opinions are properly within the scope of that undisputed expertise. (*See*

Ward Daubert Opp'n 27-29). Notably, "although New GM seeks to prevent Loudon from giving

opinions contained in nearly 30 pages of his report, New GM has not identified a single opinion

or sentence from his report that constitutes" an objectionable "'safety culture' opinion." (*Id.* at

29). Thus, New GM's motion with respect to Loudon is denied, without prejudice to objections

at trial in the event that New GM believes that Ward is seeking to elicit testimony beyond the

scope of Loudon's expertise. *See, e.g.*, *In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*,

No. MDL 2327, 2017 WL 1207979, at *3 (S.D.W. Va. Mar. 29, 2017) (noting, in the course of

---

that far, as Ward characterizes Stevick's opinion somewhat differently in his memorandum of
law opposing New GM's motion. (Ward Daubert Opp'n 23-24 (stating that Stevick's tests
indicated that "knee-key rotation was *possible* using Plaintiff's long, heavy keychain" (emphasis
added)). Accordingly, the Court reserves judgment on the issue until trial, when it also be in a
better position to evaluate the foundation for any opinions offered by Stevick. At a minimum, to
the extent that Stevick's opinions go beyond what the data would support, they are subject to
New GM's impeachment at trial.

deferring resolution of certain *Daubert* challenges until trial, that "[a]t trial, the expert testimony will be tested by precise questions asked and answered").

### 4. Dr. David Lent

The next and last expert witness targeted by New GM is orthopedic surgeon Dr. David Lent, who intends to testify about the relationship between Ward's accident and injuries. New GM contends that his opinions about injury causation are inadmissible because he "failed to consider and rule out an obvious alternative cause: plaintiff's peripheral artery disease." (New GM Daubert Mem. 18). That argument has some force, if only because (remarkably) neither Ward nor his counsel apparently informed the doctor that Ward had previously been treated for peripheral artery disease. (*Id.* at 18-20; New GM Decl. Ex 10 ("Lent Depo. Tr."), at 38). Moreover, Dr. Lent's assertion that Ward's physical limitations — including a "severe decreased range of motion" and "severe decrease in the strength" of his right leg — are "*all* casually related to the accident" seems somewhat suspect. (New GM Decl. Ex. 9 ("Lent Rpt."), at 3 (emphasis added)). Nevertheless, Dr. Lent is a qualified and experienced orthopedic surgeon, with a specialty in the patellar tendon, and has treated many patients suffering from vascular conditions in conjunction with orthopedic issues. (Ward Daubert Opp'n 32-34). Moreover, his report addresses Ward's "past medical history" — including hypertension, type II diabetes, two coronary artery bypasses, and a vascular stent in his left leg — and notes that he observed "chronic venous stasis changes of both the legs distally, but no evidence of any venous stasis ulcerations." (Lent Rpt. 3). And finally, when New GM raised peripheral artery disease as an alternative cause during his deposition, Dr. Lent reviewed records New GM provided and concluded that "the amount of disease that [Ward] has . . . is not what is causing his problems." (Lent Depo. Tr. 103). Given that record, New GM's arguments are — again — not a basis for exclusion; instead, they are a basis for vigorous cross examination. *See, e.g.*, *Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361, 366 (S.D.N.Y.

2003) ("To the extent that physicians do not fully consider and rule out all possible causes, such deficiencies generally go to the weight of the evidence, not admissibility, and weighing the evidence is a function for the jury." (internal quotation marks and alterations omitted)).

## 5. Airbag Deployment and SDM Prolongation

Finally, New GM seeks to preclude Loudon and Stevick from testifying as to "(1) the safety implications of airbag non-deployment and (2) whether New GM should have adopted crash sensing prolongation technology that would extend the timeframe during which the [SDM] . . . could deploy the airbags. (New GM Daubert Mem. 16-18). New GM contends that such opinions are irrelevant and would be unfairly prejudicial given Ward's concession that his airbags should not have deployed in his accident. (*Id.*). The contention that testimony regarding airbag non-deployment is categorically irrelevant and unfairly prejudicial, however, is without merit. Indeed, the Court has already held that Ward may offer evidence of some prior incidents involving airbag non-deployment to prove that New GM was on notice about the alleged defect (but cautioned that it will not allow "excessive" evidence on the issue). *See In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2017 WL 2493143, at *8 (S.D.N.Y. June 9, 2017); *see also In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 796846, at *5 (S.D.N.Y. Feb. 25, 2016) ("*Barthelemy/Spain Daubert Op.*") (holding, in similar circumstances, that the plaintiffs could offer some — but not excessive — evidence of airbag non-deployment). New GM's objections to Loudon's and Stevick's testimony on SDM prolongation, by contrast, are sound. Ward concedes that "there is no evidence as to whether New GM should have prolonged the ability of the SDM to deploy the airbags prior to December 1, 2012," when his car was manufactured. (Ward Daubert Opp'n 31; Loudon Depo. Tr. 75). And while he invokes Arizona's "hindsight test" — which provides that "a jury may consider

information available to the manufacturer at the time of design *as well as information available to the trier of fact at the time of trial*," *Dart v. Wiebe Mfg., Inc.*, 709 P.2d 876, 881 (Ariz. 1985) (emphasis added) — that test is limited to information "*revealed by the accident* and the testimony at trial," *id.* (emphasis added). Thus, the test does not call for admission of evidence on SDM prolongation where, as here, there is no argument that the airbags should have deployed at all. Accordingly, New GM's motion is granted to the extent that it seeks to preclude Loudon's and Stevick's testimony regarding SDM prolongation. It is denied to the extent that it seeks to preclude their testimony about airbag non-deployment altogether, but without prejudice to specific objections on Rule 403 grounds or others at trial. *See Barthelemy/Spain*, 2016 WL 796846, at *5 n.2.

## B. Ward's *Daubert* Motion

In his motion, Ward seeks to preclude New GM's biomechanics expert, Dr. Roger Nightingale, from testifying that Ward's ruptured patellar tendon could have occurred when he "slammed on the brakes" and would have occurred regardless of "whether or not [he] crashed into the vehicle in front of him." (Docket No. 3878 ("Ward Daubert Mem."), at 1). According to Ward, as "a biomechanical engineer specializing in injuries of the head and cervical spine," Dr. Nightingale is not qualified to offer his opinion as to Ward's patellar tendon injury. (*Id.* at 3). Additionally, Ward claims that Dr. Nightingale's opinion is inconsistent with and unsupported by the literature, ignores evidence of direct trauma to his knee, fails to take into account forces generated on the knee during the collision, and should be excluded as cumulative to those offered by New GM's orthopedic expert. (*Id.* at 3-15). New GM takes issue with Ward's contentions, but — without conceding the point (Docket No. 4067 Ex. A ("New GM Sur-Reply"), at 1-2) — represents that Dr. Nightingale will not testify that Ward's "patellar

tendon rupture specifically *was caused* by hard braking during the accident sequence." (Docket No. 4005 ("New GM Opp'n"), at 5 n.9; *see also id.* at 10 n.19 ("[B]ecause Dr. Nightingale will not offer a specific causation opinion here, he will not opine *when* specifically Mr. Ward sustained his patellar tendon injury . . . . Rather, he will opine that the pre-impact hard braking forces were independently sufficient to cause a patellar tendon injury of the kind suffered by plaintiff.")). New GM represents that Dr. Nightingale will opine instead only as to "the amount and sources of the forces acting on plaintiff's knee during the accident and the types of injuries those forces can cause." (*Id.* at 5).

In light of New GM's representations, and notwithstanding the amount of ink spilled by counsel despite them, there is not a lot of daylight between the parties on the proper scope of Dr. Nightingale's testimony.[3] Indeed, Ward acknowledges that testimony of the sort that New GM proposes to elicit from Dr. Nightingale is precisely the type that courts normally find biomechanical engineers are qualified to offer. (Ward Daubert Mem. 4-7; *see also* Docket No. 4055, at 1-2; New GM Sur-Reply 2). Most of Ward's remaining arguments — that Dr. Nightingale's opinion is inconsistent with and unsupported by the literature, ignores evidence of direct trauma to his knee, and fails to take into account forces generated on the knee during the collision — go to weight rather than admissibility, substantially for the reasons stated with respect to New GM's motion. Accordingly, Ward's Daubert motion is denied (in part for mootness and in part on the merits), without prejudice to objection at trial should Ward believe that New GM crosses the line by eliciting specific causation opinions from Dr. Nightingale.

---

[3]     The ink spilled includes a motion from New GM to file a brief sur-reply. (Docket No. 4067). That motion is granted.

## THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

The Court turns, then, to the parties' cross-motions for summary judgment. Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). A dispute over an issue of material fact qualifies as genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

Where, as here, a party on each side moves for summary judgment, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)). To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

## A. Ward's Motion for Partial Summary Judgment

The Court begins with Ward's motion for partial summary judgment, as it can be swiftly rejected. Relying in large part on the deposition testimony of New GM's expert, Dr. Michael Stevenson, Ward "seeks a ruling that his vehicle containing Part Number 190 was defective and unreasonably dangerous due to a manufacturing defect." (Docket No. 3884, at 10). In making this argument, however, Ward cherry picks only those deposition excerpts that help him, and ignores completely Dr. Stevenson's testimony that he "would not characterize [Ward's] switch as containing a defect"; that, "at the time of the subject accident, [Ward's] ignition switch was functioning as intended and designed"; that the average torque of Ward's 190 switch "fell within the boundaries of GM specifications"; and that he would be willing to drive Ward's Chevrolet HHR. (Docket No. 4015 ("New GM Add'l SOF") ¶¶ 81-83, 105-106, 108). Along the same lines, while Ward cites a test Dr. Stevenson performed in which the torque on his ignition switch measured 0.28 N-cm below the minimum specification of 15 N-cm, he ignores the *twenty-one other tests* in which the switch measured *above* the 15 N-cm minimum (Docket No. 4043, at 8 n.10; New GM Add'l SOF ¶ 104; *see also* New GM Add'l SOF ¶¶ 101-103), not to mention Dr. Stevenson's tests of his ignition *system* — the most relevant metric of torque performance, according to Ward's own expert — which showed an average torque of 20.78 N-cm, well above the minimum specification. (New GM Add'l SOF ¶¶ 106-107). In the final analysis, the question of whether the 190 switch (and Ward's switch, in particular) was defective is not just *an*

issue in dispute — it is perhaps *the* central dispute between the parties. And while there is certainly some evidence to support Ward's position, he falls far short of showing that the evidence on the issue is "conclusive." *Ebbert v. Nassau Cty.,* No. 05-CV-5445 (FB) (AKT), 2009 WL 935812, at *5 (E.D.N.Y. Mar. 31, 2009); *accord E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 55 (1st Cir. 2002) (observing that where "the party moving for summary judgment bears the burden of proof on an issue, he cannot prevail unless the evidence that he provides on that issue is conclusive" (internal quotation marks omitted)). Accordingly, Ward's motion for partial summary judgment must be and is denied.

## B. New GM's Motion for Summary Judgment

By contrast to Ward, New GM moves for summary judgment as to all of Ward's claims on the ground that he cannot establish that his accident was caused by a defect in his ignition switch. In the alternative, New GM moves for partial summary judgment with respect to Ward's claim under the Arizona Consumer Fraud Act ("CFA"), Ariz. Rev. Stat. Ann. § 44-1522, and his negligence claims.[4] The Court will address each argument in turn.

### 1. Causation

In light of the Court's rulings on New GM's *Daubert* motion, New GM's first argument — that summary judgment is warranted with respect to *all* of Ward's claims (Docket No. 3869 ("New GM MSJ Mem."), at 7-8) — is easily rejected. New GM's argument is premised entirely on its contention that Pitman and Stevick should not be permitted to opine that Ward's accident was caused by inadvertent rotation of the ignition switch. (*Id.*). The Court having rejected that

---

[4]  Ward does not contest New GM's motion for summary judgment with respect to his fraudulent concealment claim. (*See* Docket No. 4007 ("Ward MSJ Opp'n") 1 n.1). Accordingly, that claim is dismissed.

contention, New GM's argument obviously fails.  In any event, even without Pitman's and

Stevick's testimony, there would arguably be sufficient evidence from which the jury could

conclude that Ward's switch inadvertently rotated due to a defect, including the fact that Ward's

car was subject to the ignition switch defect recall; that his switch failed to meet GM's own

minimum torque specification in one (albeit only one) of the tests conducted by New GM's own

expert; the fact that Ward's accident involved some of conditions that, according to New GM

itself, increased the risk of an inadvertent rotation (namely, a long, heavy keychain on a slotted

key, rough road conditions, and a low position of the switch); and finally, Ward's testimony that

his car lost power.  (*See* Ward Add'l SOF ¶¶ 6, 8, 10-11, 37, 41-47, 49-57).  Taken together, that

evidence would arguably be sufficient for a reasonable juror to conclude that Ward's accident

was "proximately caused" by a defect in the ignition switch of his car (even if it would not be

sufficient to show precisely what caused the switch to inadvertently rotate).  *Andrews v. Corona*

*Elec., Inc.*, No. 09-CV-0080, 2009 WL 3790432, at *2 (Ariz. Ct. App. Nov. 12, 2009); *cf.*

*Scheuer Daubert Op*., 2015 WL 9480448 at *3 (finding that the plaintiff's expert need not "say

precisely how or when the ignition switch moved out of the run position").  Accordingly, the

Court rejects New GM's effort to dismiss all of Ward's claims for lack of causation.

### 2.  The Arizona Consumer Fraud Act

Next, New GM moves for summary judgment with respect to Ward's claim under

Arizona's CFA.  (New GM MSJ Mem. 9-11).  The statute prohibits "act, use or employment by

any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false

promise, misrepresentation, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale or advertisement of any merchandise."  Ariz. Rev. Stat. Ann. § 44-1522.  In *Sullivan v. Pulte*

*Home Corp.*, 290 P.3d 446, 453-54 (Ariz. Ct. App. 2012), *vacated in part on other grounds*, 306

P.3d 1 (Ariz. 2013), the Arizona Court of Appeals held that the CFA does not provide a cause of

action to "subsequent purchasers" of a product — that is, to someone who purchased

merchandise from someone else, who had purchased it from the manufacturer. That conclusion,

the Court reasoned, is compelled by the plain language of the CFA and "the purpose of the

implied private cause of action under the CFA." *Id.* at 454. First, the statute expressly "requires

that the alleged misrepresentations or deceptive acts be made 'in connection with the sale or

advertisement' of the [merchandise]." *Id.* at 453 (quoting Section 44-1522(A)). Second, the

purpose of the statute "is to provide injured consumers with a remedy to counteract the

disproportionate bargaining power often present in consumer transactions. Because a subsequent

purchaser is not a party to the original transaction and therefore would not encounter this

disproportionate bargaining power, such a purchaser is not within the class of consumers

intended to be protected by the implied private cause of action under the CFA." *Id.* at 454

(internal quotation marks and citations omitted).

Notably, federal courts interpreting the CFA have similarly concluded that the statute

does not allow a subsequent purchaser to bring a claim against the original seller. *See J-Hanna*

*v. Enter. Rent-A-Car Co. of San Francisco, LLC*, No. 14-15057, 2017 WL 34508, at *1 (9th Cir.

Jan. 4, 2017) (citing *Sullivan* for the proposition that "subsequent purchasers do not have a cause

of action under Arizona's Consumer Fraud Act against the seller in the original sales transaction"

and affirming summary judgment on plaintiff's CFA claim relating to her purchase of a used

car); *Grimmelmann v. Pulte Home Corp.*, 08-CV-1878 (PHX) (FJM), 2009 WL 1211771, at *3

(D. Ariz. May 1, 2009) (granting summary judgment on CFA claims by subsequent purchasers

because, *inter alia*, "[t]here is no allegation that the [defendants] were in any way involved in the

sale or related advertisement of homes"); *cf. In re Fluidmaster, Inc.*, 149 F. Supp. 3d 940, 961 (N.D. Ill. 2016) (declining to dismiss the CFA claims of initial purchasers, but noting that "if [the plaintiffs] had sold their homes (with Defendant's products inside), according to *Sullivan*, those subsequent homeowners would not have a cause of action against [the defendant] under [Arizona's CFA]"). And, as the *Sullivan* Court itself noted, "[o]ther jurisdictions with consumer protection acts have adopted a similar approach." 290 P.3d at 454 n.3 (citing cases); *see also, e.g.*, *Kennedy v. MI Windows & Doors, Inc.*, No. 2:12-CV-2305 (DCN), 2013 WL 267853, at *3 (D.S.C. Jan. 24, 2013) (finding no violation of an analogous Illinois statute where the plaintiff was a "subsequent purchaser" that "did not purchase [the good] directly from [the defendant]").

Ward does not dispute that these holdings would be fatal to his CFA claim, and for good reason: He purchased his car used from a Toyota dealer, which had itself acquired the car from the Suors, who purchased the car in 2008 from an authorized Old GM dealership. (New GM SOF ¶¶ 5-7). Instead, relying primarily on *Watts v. Medicis Pharm. Corp.*, 365 P.3d 944 (Ariz. 2016) — which held that "the CFA does not require a direct merchant-consumer transaction to support a patient's statutory claim against a drug manufacturer," *id.* at 947 — Ward contends that the CFA *does* extend to subsequent purchasers. The Court disagrees. Although *Watts* makes clear that the CFA does not require direct privity, the plaintiff in the case *was* the original consumer purchaser of the medication at issue. *Id.* at 947-48. Thus, the decision does not support the conclusion that the statute allows subsequent purchasers to bring claims against the original seller — let alone, that the statute would allow Ward, who is *two* steps removed from the original seller, to bring a claim against New GM, which was not even the original seller of the car (and, in fact, did not even exist when the original sale was made). And while it is true, as Ward notes (Ward MSJ Opp'n 18), that *Watts* involved a personal injury claim and *Sullivan*

involved an economic injury claim, that is a distinction without a difference.  Ward cites no authority for the proposition that Arizona law differentiates between personal injury and economic injury for purposes of the CFA.  And neither the text of the CFA itself nor the *Watts* and *Sullivan* decisions suggests otherwise.  In short, the Court holds that Ward, as a subsequent purchaser, may not bring a claim under the CFA against New GM.  Accordingly, his CFA claim must be and is dismissed.

### 3.  Negligence

Finally, New GM moves for summary judgment with respect to Ward's negligence claims.  First, New GM argues — as it did in earlier bellwether cases — that the applicable state law (here, Arizona) does not recognize an independent duty warn for asset purchasers like New GM and, thus, that Ward's failure-to-warn claim must be dismissed.  (New GM MSJ Mem. 13-18).  Second, New GM moves for summary judgment with respect to Ward's negligence *per se* claim.  (Docket No. 4051 ("New GM MSJ Reply"), at 14-15).  And third, New GM contends that Ward's general negligence theory — namely, that New GM had an independent duty to act reasonably — also fails.  (*Id*. at 12-13).  The Court will discuss each of these arguments in turn.

### a.  Duty to Warn

First, New GM contends that Arizona law does not — and would not — impose a post-sale duty to warn on a successor corporation (or, more precisely, an asset purchaser) and, thus, breached no such duty here.  (New GM MSJ Mem. 13-16).  In prior bellwether cases, the Court addressed this same issue under the laws of Oklahoma, Louisiana, and Virginia.  *See In re: Gen. Motors LLC Ignition Switch Litig*., 154 F. Supp. 3d 30, 37-41 (S.D.N.Y. 2015) ("*Scheuer Summ. J. Op.*"); *In re: Gen. Motors LLC Ignition Switch Litig*., 2016 WL 874778, at *6 (S.D.N.Y. Mar. 3, 2016) ("*Barthelemy/Spain Summ. J. Op.*"); *Cockram Summ. J. Op.*, 202 F. Supp. 3d at 365-72.

In each case, the Court found that whether the state at issue recognized a post-sale duty to warn was an open question. Thus, the Court undertook to predict how each state's highest court would rule on the issue based on, among other things, the influential *Restatement (Third) of Torts: Products Liability* ("Restatement"), whether other states and federal courts had recognized a duty to warn, how other courts had interpreted the particular state's products liability law, and whether recognizing such a duty would be consistent with the theory of products liability endorsed by the state. *See, e.g.*, *Scheuer Summ. J. Op.*, 154 F. Supp. 3d at 38-41. Based on those considerations, the Court held Oklahoma and Virginia would recognize a post-sale duty to warn, *see id.* (Oklahoma); *Cockram Summ. J. Op.*, 202 F. Supp. 3d at 365-72 (Virginia), while Louisiana would not, *see Barthelemy/Spain Summ. J. Op.*, 2016 WL 874778, at *6.

Although a close call, the Court concludes based on similar considerations that Arizona would also recognize a post-sale duty to warn. Like the highest courts in Oklahoma, Louisiana, and Virginia, the Arizona Supreme Court has not ruled on whether or when a successor corporation can have a post-sale duty to warn. The Arizona Court of Appeals — the intermediate appellate court — did confront the issue in *Gariby v. Evenflo Co., Inc.*, No. CA-CV 2011-0081, 2012 WL 506742 (Ariz. Ct. App. Feb. 16, 2012), but its decision was unpublished and non-precedential, *see Calpine Const. Fin. Co. v. Arizona Dep't of Revenue*, 211 P.3d 1228, 1233 (Ariz. Ct. App. 2009) ("The general rule for memorandum decisions is they 'shall not be regarded as precedent nor cited in *any* court.'" (quoting Ariz. R. Civ. App. P. 28(c) and citing Ariz. R. Sup. Ct. 111(c)), and in any event sheds only limited light on how the Arizona Supreme Court would rule on it. That is because the *Gariby* Court merely assumed, without deciding, that Section 13 of the Restatement — recognizing a successor's duty to warn — applied in Arizona. *See* 2012 WL 506742, at *3. In a footnote, the Court did observe that, "[i]n the absence of

contrary Arizona law," courts "generally . . . follow the Restatement."  *Id.* at *3 n.4.  At the same time, the Court cautioned that it would "not do so blindly when to do so would result in the recognition of a new cause of action in this jurisdiction" and noted that the appellant had not provided the Court "with any authority suggesting Restatement [Section] 13 has been adopted in Arizona or that Arizona otherwise recognizes liability for a successor's post-sale failure to warn."  *Id.* (internal quotation marks omitted).

Unlike the appellant in *Gariby*, Ward does present authority to support the view that the Arizona Supreme Court, if confronted with the question, would adopt Section 13 of the *Restatement* and recognize a post-sale duty to warn on the part of an asset purchaser.  (Ward MSJ Opp'n 8-12).  As Ward notes, that is the position adopted by the only other courts that appear to have addressed the issue under Arizona law.  *See Knott v. Deese*, No. 3:11-cv-158 (CMC), 2012 WL 1106926, at *7 (D.S.C. Apr. 2, 2012); *Gariby v. Rivera*, No. C20074296, 2008 WL 8971453 (Ariz. Super. Sept. 16, 2008) ("*Rivera*").  And more broadly, "[t]he Arizona Supreme Court has repeatedly reaffirmed that, in the absence of a controlling statute or precedent, it will follow the Restatement of the Law whenever it is applicable."  *In re Air Crash Disaster Near Chicago*, *Ill.*, 803 F.2d 304, 311 (9th Cir. 1986).  As it was in Oklahoma and Virginia, therefore, "the *Restatement* has been highly influential in [Arizona] products liability law (at least with respect to negligence claims and, in particular, duty-to-warn claims)." *Cockram Summ. J. Op.*, 202 F. Supp. 3d at 368; *accord Scheuer Summ. J. Op.*, 154 F. Supp. 3d at 39; *see Sw. Pet Prod., Inc. v. Koch Indus., Inc.*, 273 F. Supp. 2d 1041, 1052, n.17 (D. Ariz. 2003) ("'The Supreme Court of Arizona (and other Arizona courts) have relied on the Restatement (Third) of Torts to determine the current state of the law on strict products liability and consider it relevant to today's tort law regime."); *Gebhardt v. Mentor Corp.,* 191 F.R.D. 180,

185 (D. Ariz. 1999) ("[A]lthough no Arizona case has formally adopted the Restatement (Third) of Torts, Arizona has demonstrated a willingness to look to the Restatement (Third) as the current statement of the law."); *Shell Oil Co. v. Gutierrez*, 581 P.2d 271, 277 (Ariz. Ct. App. 1978) (turning to the *Restatement* to determine the scope of a remote supplier's duty to warn in a products liability case). In light of that authority, the Court concludes that the Arizona Supreme Court would also adopt the *Restatement*'s position on whether and when a successor corporation can be liable for a failure to warn.

In arguing that Arizona would not recognize a post-sale duty to warn, New GM relies principally on *Winsor v. Glasswerks PHX, L.L.C.*, 63 P.3d 1040 (Ariz. Ct. App. 2003). (New GM MSJ Mem. 15-16). Specifically, New GM cites *Winsor* for the proposition that, under Arizona products liability law, liability is generally limited to those "who are involved in the chain of production or distribution of the product." *Winsor*, 63 P.3d at 1049. (New GM MSJ Mem. 15-16). But the Court in *Winsor* did not address the question presented here — namely, whether and when a successor (or asset purchaser) can be held liable for its own failure to warn about a known defect in a product manufactured by its predecessor. Nor did it consider Section 13 of the *Restatement*. Instead, the *Winsor* Court was concerned with the scope of a successor's liability for the acts of its predecessor, and looked to Section 12 of the *Restatement*. *See id.* at 1044-45. The Court concluded that Arizona products liability law prizes a causal nexus between a defendant and the chain of production or distribution that would be undermined by adoption of additional exceptions to Section 12. *Id*. at 1047-48. Contrary to New GM's argument, however, *Winsor*'s holding is not inconsistent with adoption of *Restatement* Section 13, which holds a successor liable for *its own* conduct rather than the conduct of its predecessor. *See Rivera*, 2008 WL 8971453, at *2 ("*Winsor* applied Restatement (Third) of Torts [Section] 12 and did not

discuss the applicability of Restatement (Third) of Torts [Section] 13 . . . . This court does not read *Winsor* to suggest that Arizona would not apply [Section] 13.").

If anything, *Winsor* cuts in favor of holding that the Arizona Supreme Court would adopt Section 13 of the *Restatement* rather than against it. First, *Winsor* underscores the influential role of the *Restatement* in Arizona law. After all, the *Winsor* Court reaffirmed that Section 12 of the *Restatement* applies in Arizona, *see* 63 P.3d at 1044-45, while declining the appellant's invitation "to *expand* the scope of products liability actions" *beyond* the boundaries of Section 12, *see id.* at 1042 (emphasis added). Here, of course, Ward does not seek to expand the scope of products liability law beyond Section 13; he seeks to avail himself of Section 13 itself. Second, adoption of Section 13 is consistent with the *Winsor* Court's focus on the "causal relationship between the defendant's acts and the plaintiff's injury" and its emphasis on "broadly constru[ing] the reach of products liability." 63 P.3d at 1049 (noting that Arizona courts have found liability for "those involved in used goods," among others not directly involved in manufacturing the product); *cf. Scheuer Summ. J. Op.*, 154 F. Supp. 3d at 38 (holding that the Oklahoma Supreme Court would adopt Section 13 based in part on the fact that Oklahoma courts have "extended liability beyond manufacturers to entities that have some relationship with the product alleged to have caused a plaintiff's injuries, either through manufacturing, selling, or distributing the product" (internal quotation marks omitted)). And finally, if *Winsor* clearly precluded a successor corporation's duty to warn, as New GM maintains, it is curious that the Court in *Gariby* — decided nine years after *Winsor* and confronting the exact question presented here — merely cited the case for the proposition that Arizona "*does* recognize[] successor liability for harm caused by defective products sold by its predecessor in some circumstances, consistent with the Restatement." *Gariby*, 2012 WL 506742, at *3 n.4 (emphasis added). In

short, *Winsor* reinforces the Court's conclusion that the Arizona Supreme Court would, if confronted with the issue, adopt Section 13 of the *Restatement*.

Additionally, substantially for the reasons provided in earlier opinions, the Court concludes that the Arizona Supreme Court would find a duty to warn on the facts of this case. *See Scheuer Summ. J. Op.*, 154 F. Supp. 3d at 40; *Cockram Summ. J. Op.*, 202 F. Supp. 3d at 369. As the Court noted in the first bellwether case, "[t]he primary factor courts have looked to in this context is whether the successor corporation assumed service and repair duties to predecessor products." *Scheuer Summ. J. Op.*, 154 F. Supp. 3d at 40; *see also* Restatement (Third) of Torts: Products Liability § 13, cmt. b (1998) (noting that courts should consider whether the successor sells or offers to sell "spare parts to the predecessor's customers for machinery sold by the predecessor . . . in deciding whether sufficient actual or potential economic advantage has accrued to the successor to warrant the imposition of a duty to warn"). Here, New GM plainly "agree[d] to provide services for maintenance or repair of [Old GM vehicles]" and "enter[ed] into a similar relationship with purchasers of the predecessor's products giving rise to actual or potential economic advantage to [New GM]." Restatement § 13. As recounted in both *Scheuer* and *Cockram*, "Section 2.3 of the 2009 Sale Agreement provides that New GM assumed all liabilities under express warranties, even for Old GM cars sold before the bankruptcy; that creates obligations with respect to Old GM vehicles still under warranty, and presumably also means that New GM continued to provide spare parts and services for Old GM vehicles even after warranties expired." *Scheuer Summ. J. Op.*, 154 F. Supp. 3d at 40; *Cockram Summ. J. Op.*, 202 F. Supp. 3d at 369. Similarly, "[t]he notification and recall obligations under the Safety Act that New GM inherited provide another kind of service and repair duty . . . [that] put New GM into a position of ongoing communication with Old GM

purchasers." *Scheuer Summ. J. Op.*, 154 F. Supp. 3d at 40.  In short, "the 2009 Sale Agreement imposed a contractual warranty duty on the part of New GM to Old GM vehicles and New GM had a continuing duty to monitor and notify Old GM purchasers of defects.  This is the kind of relationship that gives rise to a duty to warn."  *Id.* at 40-41 (internal quotation marks, brackets, and ellipsis omitted).

New GM's arguments to the contrary fall short.  For example, New GM contends that Ward "has not submitted *any* evidence of a pre-accident relationship between plaintiff and New GM."  (New GM MSJ Reply 9).  The focus of the relevant inquiry, however, is not on New GM's interactions with Ward alone, but with Old GM's "customers in general."  *Cockram Summ. J. Op.*, 202 F. Supp. 3d at 370.  Relatedly, the key issue is not how many calls, letters, or e-mails the parties exchanged.  Instead, it is on whether the defendant "undert[ook] or agree[d] to provide services for maintenance or repair of the product."  Restatement § 13; *see Herrod v. Metal Powder Prod.*, 413 F. App'x 7, 14 (10th Cir. 2010) ("And, whether or not [the defendant] actually provided any repairs or maintenance services likewise does not change the fact that [the defendant] agreed to provide services for maintenance or repair of [the product].").  Because New GM was in "a position of ongoing communication with Old GM purchasers" — by virtue of its "continuing [statutory] duty to monitor and notify Old GM purchasers of defects" — the pre-accident communication between the parties, or lack thereof, is inconsequential to the analysis.  *Scheuer Summ. J. Op.*, 154 F. Supp. 3d at 40-41.  Finally, New GM also argues that the Sale Agreement, standing alone, is insufficient to establish its duty to warn.  (New GM MSJ Mem. 17).  But the Court previously rejected just that argument.  *See Cockram Summ. J. Op.*, 202 F. Supp. 3d at 369 n.4.  And New GM cites no authority — in Arizona or elsewhere — calling for a different conclusion.  In fact, one of the cases cited by New GM, *Lips v. Scottsdale*

*Healthcare Corp.*, 229 P.3d 1008, 1010 (Ariz. 2010), explicitly provides that "[d]uties of care may arise from special relationships based on contract." (*See* New GM MSJ Mem. 17-18). In short, the Court concludes that New GM owed Ward a duty to warn and, thus, its motion for summary judgment on the post-sale duty-to-warn claim must be denied.

### b. Other Theories of Negligence

In any event, Ward has two other viable theories of negligence. First, he brings a negligence *per se* claim based on New GM's alleged failure to notify the National Highway Safety Administration and Old GM vehicle owners of safety-related defects as required by 49 U.S.C. § 30101, *et seq.*, and 49 C.F.R. §§ 573, 577. (Am. Compl. ¶ 125). New GM did not move for summary judgment on that claim until its reply memorandum of law (New GM MSJ Reply 14-15) — which is too late. *See, e.g.*, *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14–MD–2543 (JMF), 2015 WL 7769524, at *1 (S.D.N.Y. Nov. 30, 2015) (enforcing against New GM the rule that arguments raised for the first time in a reply brief are waived). And, in any event, the Court has previously rejected New GM's principal argument to the contrary — that any duty stems from the Sale Agreement, which contains a provision limiting third-party liability — and New GM provides no reason to reconsider or distinguish that decision. *See Cockram Summ. J. Op.*, 202 F. Supp. 3d at 371.

Finally, Ward has a valid claim that — because it "continued to service and monitor Old GM vehicles for safety defects," it "was exclusively vested with knowledge of the defect and the ability to communicate the nature of the defect to purchasers," and it initiated recalls — New GM owed a general duty to consumers to act reasonably to protect their safety. (Ward MSJ Opp'n 15-16). The Court in *Scheuer* found that such a duty "clearly" existed under Oklahoma law, *see* 154 F. Supp. 3d at 43, and Arizona law is much the same. Like Oklahoma common

law, Arizona common law imposes a general duty of ordinary care on all actors that could be foreseeably harmed by the party's conduct. *See, e.g.*, *Stengel v. Medtronic Inc*., 704 F.3d 1224, 1233 (9th Cir. 2013) ("Plaintiffs' claim is brought under settled Arizona law that protects the safety and health of Arizona citizens by imposing a general duty of reasonable care on product manufacturers."); *Stanley v. McCarver*, 92. P.3d 849, 856 (Ariz. 2004) (finding a duty of care in the absence of a formal doctor-patient relationship); *Ramsey Air Meds, L.L.C. v. Cutter Aviation, Inc.*, 6 P.3d 315, 321 (Ariz. Ct. App. 2000) (finding that a pilot owed "duties of due care to all persons within the foreseeable zone of danger — including operators of other aircraft, passengers, bystanders, and the owner of the aircraft"); *Rudolph v. Arizona B.A.S.S. Fed'n*, 898 P.2d 1000, 1002 (Ariz. Ct. App. 1995) ("Courts take a broad view of the class of risks and the class of victims that are foreseeable for the purpose of finding a duty."); *Schnyder v. Empire Metals, Inc.,* 666 P.2d 528, 530 (Ariz. Ct. App. 1983) ("The scope of the risk created by one's conduct defines the group of potential plaintiffs to whom a duty is owed."); *see also Crouse v. Wilbur–Ellis Co*., 272 P.2d 352, 365 (Ariz. 1954) ("The whole modern law of negligence, with its many developments, enforces the duty of fellow-citizens to observe in varying circumstances an appropriate measure of prudence to avoid causing harm to one another.").

New GM's argument to the contrary — that New GM did not manufacture or distribute Ward's vehicle — centers once again on *Winsor*. (New GM MSJ Reply 13). But, as discussed above, New GM reads that case too broadly. Unlike the appellant in *Winsor*, Ward argues that New GM owed him a general duty of care by virtue of its *own* relationship to purchasers of Old GM vehicles. (*See* Ward MSJ Opp'n 15-16). Additionally, under Arizona law, a "special or direct relationship" is "not essential in order for there to be a duty of care." *Gipson v. Kasey*, 150

P.3d 228, 232 (Ariz. 2007); *see, e.g.*, *Rudolph*, 898 P.2d at 1002 ("There is no requirement that a foreseeable plaintiff must be connected with or personally known to the defendant for a duty to exist."). Instead, "[d]uty is defined as an obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Gipson*, 150 P.3d at 231 (internal quotation marks omitted). If taken to its logical conclusion, New GM's argument would suggest that, had the company learned as a result of its own internal testing that 2009 Chevrolet HHRs were prone to spontaneous combustion, the company would have had no independent duty to warn vehicle owners or to recall its vehicles. That position is absurd on its face, not to mention inconsistent with both Arizona tort law generally and *Winsor*'s focus on the "causal relationship between the defendant's acts and the plaintiff's injury" specifically. 63 P.3d at 1049. The Court therefore denies GM's motion for summary judgment on Ward's general negligence claim also.

## CONCLUSION

For the reasons given above, New GM's *Daubert* motion is granted in part and denied in part, and Ward's *Daubert* motion is denied in its entirety (albeit without prejudice to his objections to specific testimony at trial). Additionally, New GM's motion for summary judgment is denied to the extent it seeks dismissal of all Ward's claims on causation grounds and his claims sounding in negligence on other grounds, but is granted to the extent that it seeks dismissal of Ward's fraud claims — that is, his claim of fraudulent concealment and his claim under Arizona's CFA. (It follows that New GM's motion is also denied to the extent it seeks dismissal of Ward's claims for punitive damages, as he may seek punitive damages in connection with his "Independent Claims" of negligence.) Finally, Ward's motion for partial

summary judgment — seeking a finding that vehicles containing the 190 switch, including his own, were manufactured defectively — is denied.

The Clerk of Court is directed to terminate 14-MD-2543, Docket Nos. 3868, 3873, 3877, and 3882; and 14-CV-8317, Docket Nos. 193, 198, 202, and 206.

SO ORDERED.

Date: June 20, 2017
      New York, New York

                                          JESSE M. FURMAN
                              United States District Judge